COMMISSIONER OF INTERNAL REVENUE, Petitioner,

v.

H. Halpine SMITH and George K. Yetter (Mrs. Addie Small Smith, as Executrix of the Estate of H. Halpine Smith, substituted for H. Halpine Smith, deceased), Respondents.

Berlin GRIFFIN, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 18243.

United States Court of Appeals
Fifth Circuit.

Dec. 6, 1960.

David O. Walters, Sharon L. King, Robert N. Anderson, and Meyer Rothwacks, Attys. Dept. of Justice, Rollin H. Transue, Special Atty., Hart H. Spiegel, Chief Counsel, Internal Revenue Service, Washington, D. C., Charles K. Rice, Asst. Atty. Gen., Dept. of Justice, for petitioner.

John E. Mahoney, Brooklyn, N. Y., Benjamin Alpert, Newark, N. J., Myles J. Sachs, New York City, of counsel, for respondents.

Before RIVES, Chief Judge, and TUTTLE and WISDOM, Circuit Judges.

TUTTLE, Circuit Judge.

This petition for review of a decision of the Tax Court attacks the sufficiency of the evidence to warrant the findings of fact and conclusions of law imposing income tax deficiencies and penalties for the years 1943 and 1944.

Principally involved here is the question whether the Tax Court's finding that overceiling payments totalling $185,-782.88 and $90,000, respectively, were paid to the individual taxpayer Griffin was based upon substantial evidence, first, that the payments were received by Griffin and, if so, second, that such payments became the income of Griffin himself rather than of the partnership of which he was a member and the sale of whose liquor produced such overceiling payments.

The background essential to an understanding of the case can be briefly stated. It is undisputed the Griffin was a member of two partnerships, Wathen Bros. Distillers and Palm Beach Distributors, in Palm Beach, Florida, during parts of the years 1943 and 1944. Each of these partnerships became the owner of a very large quantity of bottled whiskies. Under existing OPA regulations these partnerships were permitted to sell these whiskies for a reasonable markup. This they did during the years in question and received payments during these years amounting to very substantial gross income. The books and records of the partnerships reflected sales of all of the liquor known to have been disposed of by the partnerships and such records reflected the receipt by them of the OPA price.

Federal income tax returns were filed by the respective partnerships and individual tax returns were filed by the individuals reflecting the profits as disclosed by the books.

After investigation by internal revenue agents, deficiencies in income taxes for the years 1943 and 1944 were asserted against Griffin. The explanation of the deficiencies was that Griffin had received substantial overceiling payments from persons to whom he arranged sales of the partnerships' whiskey. The explanation as stated in the deficiency notice for 1943 was:

"It is determined that you received an aggregate of $185,782.88 in excess of ceiling prices for whiskey sold in 1943 and that no part of these overceiling receipts was reported in your 1943 income."

In his petition filed in the Tax Court Griffin attacked these deficiencies, and it was upon this attack and the denials contained in the answer that the burden was assumed by the taxpayer to prove the incorrectness of the commissioner's determinations.

The Tax Court made findings that Griffin did receive total overceiling payments in the amounts of $185,782.88 and $90,000 in the years 1943 and 1944 respectively.

Approaching the first question, that is whether there is evidence to support the finding that payments in such amounts were made to Griffin, we find that as to the sum of $152,175 in 1943 and $90,000 in 1944, there was express categorical testimony given by the persons who made the payments that they had arranged with Griffin to pay such amounts in excess of OPA ceiling prices in return for his selling them the whiskey, and that they had either actually paid him the amounts in cash in person or had paid them to someone authorized by Griffin to receive it. There can thus be no doubt as to the substantiality of the evidence supporting the findings of the Tax Court as to the fact of payment to Griffin to the extent indicated. These amounts represented transactions with two named purchasers, Best and McDonough. The sums also proved out mathematically by multiplying the rate per case of overceiling payment testified to by the number of cases shown on the books of the partnerships to have been sold to these two purchasers.

Two other transactions were involved in the proof and in the findings of the Tax Court. One of them related to a transaction between Colin L. Britt and Griffin, which was reduced to writing during the year 1943.[1]

It is not disputed that Griffin received this sum of $85,000 on September 23, 1943, nor is it disputed that Griffin caused delivery to Britt of approximately 21,000 cases of bourbon whiskey from the stocks of the two partnerships. Britt was inducted into the Army in the early part of 1944 at a time when he had been unable to deliver the items for which he had obligated himself under the written memorandum. Thereupon they arrived at a settlement agreement.[2] After Britt

[1]. This agreement is here reproduced:
"Received from C. L. Britt
"Eighty five Thousand Dollars to hold as deposit against the following liquors he will obtain for me against Bourbon Whiskey I will obtain for him, he will obtain the following liquors
5000 cases Ushers Scotch
2000 cases White Horse Scotch
200 cases Watsons Scotch
"This money will be returned to C. L. Britt when this merchandise is received by me—
"(signed) Berlin Griffin
"This is my understanding
"(signed) C. L. Britt."

[2]. A preliminary settlement was reflected by the following memorandum signed on April 18, 1944:
"To Berlin Griffin
"This will confirm the nature of our transaction on or about Sept. 28, 1943. I gave you 85000, Eighty-Five Thousand Dollars to be used as a Deposit against delivery by me to you of the Following Merchandise:
5000 cases of Ushers Scotch
5000 cases Domestic wine
1000 cases White Horse Scotch
200 cases King James Scotch
"Against the above I have obtained for you 500 cases Ushers Scotch and 2000

had made some further deliveries, an agreement was entered into between him and Griffin on November 24, 1944, concurred in by the other two partners of the Palm Beach Distributors, under which $10,000 was returned to Britt and the remaining $75,000 was divided equally among the three partners. The partners made this settlement by calculating that the $75,000 retained represented the profit which the partnership would have made on all the whiskey if Britt had delivered it as agreed. Griffin reported his $25,000 as income on his 1944 return. The Commissioner contended that this $85,000 was also an overceiling payment to Griffin in 1943. Upon receipt of proof establishing the circumstances just recited, the Tax Court decided that it was not an overceiling payment but that it represented a legal profit actually received by the partnership in 1944 when the contract was liquidated.

The remaining transaction as to which proof was offered in support of the Commissioner's claim of overceiling payments of an additional $33,607.88 in 1943 was testified to by one Burg. Mr. Burg's testimony was very short and to the point. He testified that in 1943, "Mr. Griffin had some whiskey and I wanted to get some and he came into Columbia [South Carolina] and he told me that he would sell me some." The following was then testified to:

"Q. What price did Mr. Griffin quote you? A. It was my understanding that it was $7.50 over the OPA ceiling price.

"Q. How was that $7.50 to be paid? A. In cash.

"Q. Did you place an order for whiskey? A. Yes, I did.

cases of wine—up to date you have shipped practically all the Bourbon which we agreed on.

"It was our agreement that you would return to me the deposit which I made you as soon as I had obtained the whiskies for you.

"I feel under the existing circumstances that I have given the facts as they were—

"Q. Did you subsequently receive that whiskey? A. I did.

"Q. Do you recall the brand of the whiskey? A. I don't recall the name of the brand. I think it was two brands, but I think one of them was 'Plainsman.' "

Evidence in the form of entries in the books of the partnerships showed that over the period September 1 to September 23 one of the partnerships shipped to Burg's company in Columbia 10,121$^{11}$⁄₁₂ cases of whiskey, which were billed to Burg and paid for by him at the OPA ceiling prices.

On cross examination counsel for the taxpayer asked Mr. Burg, "Did you ever give Mr. Griffin any money?" and the witness answered, "No, I didn't." Further, on cross examination, the following testimony was elicited:

"Q. Who got that money that you were talking about, this $7.50 a case? Whom did you give that to, if you gave it?

"A. Well, Ben Yaffee came up. We had discontinued buying any whiskey, and we had some money left. And then Yaffee came up, and I gave him the money, and he took it; or is supposed to have taken it, to Berlin Griffin. I do not know whether he did or not."

Ben Yaffee was a partner of taxpayer Griffin. No objection was made to this question or answer, which, as will be noted, was elicited by the taxpayer's counsel on cross examination.

The taxpayer seriously urges here that this evidence is not sufficient to support a finding of the Tax Court that the determination of the Commissioner touching on this $33,607.88 item was correct.

"Due to the fact that I am in the army at the present time I won't be able to deliver my commitment and some adjustment will have to be made on the Deposit I Paid You—

"(signed)    C. L. Britt

"This is my understanding

"(signed)    Berlin Griffin"

Griffin took the stand as a witness and denied generally the receipt of any over-ceiling payments and, with respect to the Burg transactions, he expressly denied having received any overceiling payment from Burg. The Tax Court rejected Griffin's denial of the receipt of payments of $152,175.00 in 1943 and $90,000.00 in 1944. As to these payments the court said:

> "The witnesses, McDonough, Best, and Frawley testified clearly, une-quivocally, and without hesitation. Having observed their demeanor on the witness stand and having ana-lyzed their testimony, we believe that they were testifying truthfully. From a consideration of their testi-mony and the record as a whole, we have concluded and have found as a fact, contrary to the testimony of the petitioner Griffin, that Griffin did receive overceiling payments in the aggregate amounts of $152,175 in 1943 and $90,000 in 1944."

Moreover, commenting on Griffin's tes-timony in a memorandum denying Grif-fin's motion for reconsideration of the decision, the Tax Court said, "There was also other evidence in the record indicat-ing that the taxpayer was not truthful. Furthermore, the fact that he had been convicted of OPA violations[3] tends in our opinion to discredit his testimony. These factors, in addition to our impres-sions of the witness upon the stand, lead us to believe that he was not telling the truth."

In the light of the circumstances here outlined the taxpayer complains that the only basis upon which the Tax Court could support a finding of the deficiency of $33,607.88 was the presumption of correctness of the Commissioner's deter-mination. Petitioner says that such pre-sumption dropped out of the case once evidence was produced and that the case must thereafter be decided solely upon the evidence presented, citing Estate of Gillette v. Commissioner, 9 Cir., 182 F.2d 1010; Hemphill Schools, Inc. v. Commis-

sioner, 9 Cir., 137 F.2d 961; and J. M. Perry & Co., Inc. v. Commissioner, 9 Cir., 120 F.2d 123.

The parties agree that there is an initial presumption of correctness that places upon the taxpayer the burden of proof that the Commissioner's determin-ation is erroneous. Welch v. Helvering, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212; Strawder v. C. I. R., 5 Cir., 277 F.2d 753; Archer v. C. I. R., 5 Cir., 227 F.2d 270. The parties are in disagreement, how-ever, on the effect to be given to proof by the taxpayer which tends to disprove the whole basis of the Commissioner's deter-mination or which tends to prove its in-correctness in some but not all of the de-tails which go to make up the asserted deficiency.

The Supreme Court has held that where the trial court has held that a basis or theory of arriving at a deficiency is erroneous, there is no burden placed on the taxpayer to prove the exact amount of the tax owed by him. Helvering v. Taylor, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623. This is no guide to us in de-termining the standards of proof which the trial court must apply in deciding whether the Commissioner's basis of computation is or is not erroneous. Moreover, it is not authority for the proposition that if the trial court finds the Commissioner's determination to be correct as to certain identifiable items (here the Best and McDonough transac-tions) but incorrect as to others (here the Britt transaction) this destroys the presumption of correctness of others not included in either. We have dealt with this question in Anderson v. C. I. R., 5 Cir., 250 F.2d 242. We held there that a finding against the Commissioner on one item still leaves on the taxpayer the burden of showing with respect to each other item that the Commissioner was wrong, 250 F.2d 242, 246.

The taxpayer here, however, argues that since Griffin testified that he had not received any overceiling payments from Burg, the Commissioner's presumption

3. The record discloses that he had been convicted four times for OPA violations, once on a plea of guilty, and three times following a plea of nolo contendere.

fell and he had thus carried the burden of proof.[4]

We think we need not determine in this case exactly what quantum of proof beyond the mere denial by the taxpayer of the receipt of income is necessary to overcome an initial presumption of correctness of the deficiency determination, because it is plain that on the express finding here that the court did not credit Griffin's testimony there was no competent proof to cause the presumption to disappear.

Courts have repeatedly held, as this Court did in Archer v. C. I. R., supra, that the court "is not bound to accept testimony at face value even when it is incontroverted if it is improbable, unreasonable or questionable." 227 F.2d 270, 273. In the cases cited by the taxpayer this same principle is given effect. In the Perry case, supra, [120 F.2d 124], the court said the presumption can be destroyed only by the introduction of "competent and relevant evidence." In San Joaquin Brick Co. v. C. I. R., 9 Cir., 130 F.2d 220, 225, the court said: "If the taxpayer fails to present *substantial* evidence on every point necessary to entitle him to the deductions claimed, this Court upon petition for review necessarily will hold against their allowance. In doing so we are not considering proof nor are we weighing the evidence." (Emphasis added.) Niederkrome v. C. I. R., 9 Cir., 266 F.2d 238, 241, says that the presumption of correctness disappears "once evidence *which would support a contrary finding* has been adduced." (Emphasis added.) The Tax Court's rejection of Griffin's self serving statement that he did not receive the payments as not worthy of belief left the taxpayer's case without the quality of proof required to overcome the presumption.

Moreover, we think that the testimony of Burg that he agreed to pay Griffin $7.50 a case in overceiling payments and that he received over 10,000 cases and that he gave an unstated sum of money representing $7.50 a case to Yaffee, who was supposed to have taken it to Griffin, is sufficient by way of affirmative proof to warrant the Tax Court's finding that as much as $33,000 was received by Burg on account of this transaction.

The next question is whether there was any basis on the record in the Tax Court to support its holding that the sums paid to Griffin were his income. It is his contention that the evidence demanded a determination that the payments, if made, became income of the partnership. It is not disputed that Griffin, Smith and Yetter were partners in the operation of the two businesses that owned and sold the whiskey. It is also not disputed that these three were partners in other businesses, and that Smith and Yetter devoted their time to them while the business of the whiskey distributorships was run almost entirely by Griffin. The Tax Court found that the three partners were equally interested in the partnership, and it was on this basis that the liquidated damages from Britt were divided in the year 1944. However, the partnership agreement itself was not before the Tax Court. The court said, "While there seems to be no question raised here as to the fact that each petitioner (Griffin, Smith and Yetter) owned a one-third interest in Palm Beach Distributors, we do not know the terms of the partnership agreement. Indeed, we do not know whether such agreement was oral or written." There is no doubt that the liquor which was sold belonged to the partnership, but, as found by the Tax Court, "we do not think it necessarily follows that each partner would be entitled to a one-third interest of any illegal receipts by one of the partners." We recognize, as did the Tax Court, that the partnership

---

4. There is a strongly urged legal theory that the presumption of correctness of the Commissioner's findings would not be completely out of the case even if competent credible evidence had been introduced to contradict it. Such a theory has been discussed at length by writers on evidence. See Jones on Evidence, Vol. 4, p. 1904, et seq. and McCormick on Evidence, §§ 313–317. And see Caudillo v. United States, 9 Cir., 253 F.2d 513, 518. See also the discussion of this principle in Walker v. United States, 5 Cir., 285 F.2d 52.

agreement might have included any such income. Whether it did or not must depend on the proof.

■ Here, the taxpayer and his partners were in a difficult position. Ordinarily the payment of money as the result of a business transaction to one person who may under' some reasonable circumstances be entitled to it, is of itself affirmative evidence that he has received income.[5] Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731.

■ When such a person seeks to show that the receipt of money in respect of such transaction represents income to another rather than to himself, therefore, he is under the burden of proving the nature of the transaction and that the payments really belong to others, rather than to himself. Griffin or Smith or Yetter could have testified, had such been the fact, that their partnership agreement comprehended all transactions, whether legal or illegal, carried on by any partner dealing with the partnership whiskey. They could have testified that they received their part of the payments or that they were entitled to them if not actually received. Instead of doing this Griffin swore he had not made the transactions at all and had not received the money and the others testified they had not received any of the money and they knew of none of the transactions. Yet we find that the Tax Court had ample basis for disbelieving Griffin, which it did, and, therefore, the question, "What did he do with the money?" remains unanswered. The other partners may have thought that they could not afford to testify as to their

agreement about the matter without weakening Griffin's principal contention, i. e., that he did not receive the money at all.

■ The petitioner points to two circumstances as evidencing an agreement that all receipts were to be treated as partnership income. The first is that when the Britt $75,000 was finally agreed upon Griffin turned over one-third each to the other two. Yet he says the Commissioner claimed that this was an over-ceiling payment. The answer is twofold: First, the court found it was not an overceiling payment and the treatment afforded it by the partners would not tend to prove anything as to an overceiling payment, and, second, if it is to be treated as such, then it is clear that it was treated differently than the others because it was actually divided among the partners, entered on the partnership books and reported by the partners as income in 1944. The other circumstance is the fact that when Griffin was indicted and convicted for OPA violations the partners paid a share of fines and fees. The Tax Court considered this circumstance, but concluded that it could not find, as a fact, that either Yetter or Smith was entitled under the partnership agreement to part of the illegal payments obtained by Griffin by his individual negotiations. Here, again, the taxpayer failed to carry the burden of convincing the court on this fact issue that what was received by him was in truth income of the partnership rather than of himself.

We do not hold, of course, that income of a partnership is not taxable to the partner merely because it is not distrib-

5. Section 22(a) of the Internal Revenue Code of 1939 provides:
"Sec. 22. Gross income.
"(a) [as amended by Sec. 1, Public Salary Tax Act of 1939, c. 59, 53 Stat. 574] General definition—'Gross income' includes gains, profits, and income derived from salaries, wages, or compensation for personal service (including personal service as an officer or employee of a State, or any political subdivision thereof, or any agency or instrumentality of any one or more of the foregoing), of whatever kind and in whatever form paid, or from professions, vocations, trades, business, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever." 26 U.S.C.A. (I.R.C.1939, Sec. 22(a).

uted. See Bell v. C. I. R., 5 Cir., 219 F.2d 442. We say merely that the question, "Whose income is it?" is a question of fact. On this record we find that the Tax Court did not err in finding that it was Griffin's income.

 We come next to the question whether there was sufficient evidence to sustain the Tax Court's finding of fraud. On this point the Court said:

"Here the evidence is clear and convincing that the petitioner Griffin did agree to sell whiskey at over-ceiling prices to McDonough and Best and that he did receive overceiling payments of $152,175 in 1943 and $90,000 in 1944, and we have so found as facts. In so finding, we have not, to any extent, relied upon the presumption in favor of the correctness of the respondent's determination, but have relied upon the record as a whole and in particular the testimony, which we believe to be truthful, of McDonough and Best, who testified in detail as to their payments, in some instances directly to Griffin.

"From our observation of the petitioner Griffin, his testimony, and the evidence as to his large and varied business activities, it is apparent that he is a man of intelligence. It is inconceivable that he would not have known that these payments constituted taxable income. Furthermore, it is inconceivable that such large amounts as are here involved could have been omitted by inadvertence in both years. Indeed, no such contentions are made by the petitioner Griffin, his contention being simply that no such overceiling payments were received. We think it is reasonable to conclude that his omission of these amounts was willful and with intent to evade tax."

There may be added the comment that the very motive which caused the appellant to charge the illegal overceiling prices, and thus cheat his customers, may be considered by the trial court as part of the circumstances to be weighed in determining whether there was an intent to defraud the government by failing to pay his taxes. We conclude there was no error in the finding of fraud.

We find no merit in the subsidiary points raised on appeal, although they have been carefully considered.

The Commissioner filed a protective appeal from the Tax Court's decision that these payments were income to the individual and not to the partnership. This was done so that if we reversed on this principal point the Court could still enter a decision making the payments taxable to the partnership.

We affirm the decision of the Tax Court in the Berlin Griffin case, and thus affirm its decision in the other case as well.