746 F.2d 327
 84-2 USTC P 9862
 ESTATE of Vincent DeNIRO, Deceased, Helen M. Papalie and
Joanne F. DeNicholas, Administratrices, Louis R. DeNiro,
Transferee, Frank DeNiro, Transferee, and Michael DeNiro,
Transferee, Petitioners-Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.
 No. 83-1100.
 United States Court of Appeals,
Sixth Circuit.
 Argued Jan. 17, 1984.
Decided Oct. 17, 1984.
 
 James C. Herndon, William T. Walker, Robert W. Malone (argued), Buckingham, Doolittle & Burroughs, Akron, Ohio, for petitioners-appellants.
 Kenneth W. Gideon, Chief Counsel Internal Revenue Service, Glenn L. Archer, Jr., Michael L. Paup, Jonathan S. Cohen, Stephen Gray (argued), Tax Division, Dept. of Justice, Washington, D.C., for respondent-appellee.
 Before KEITH, MERRITT and WELLFORD, Circuit Judges.
 WELLFORD, Circuit Judge.
 
 
 1
 The estate of Vincent DeNiro appeals from the tax court's determination that the payment of the estate's tax liability in 1969 by two corporations constituted income to the estate in the form of a constructive dividend. The estate further disputes the penalty imposed upon the estate for failing to file a tax return for 1969. We affirm in part and remand for further proceedings.
 
 I.
 
 2
 The parties to this controversy have been litigating tax matters for many years following the death of Vincent DeNiro under mysterious circumstances in the Cleveland area in 1961.[1] This court first considered matters relating to the DeNiro estate in a review of the convictions of Frank, Louis, and Michael DeNiro, brothers of the deceased, for conspiracy and wilfully attempting to evade federal estate taxes due from Vincent DeNiro's estate. The convictions were affirmed. See United States v. DeNiro, 392 F.2d 753 (6th Cir.), cert. denied, 393 U.S. 826, 89 S.Ct. 89, 21 L.Ed.2d 97 (1968). The court observed that the deceased, known as Vince, "had accumulated wealth in the numbers business in Youngstown, Ohio." Id. at 754. While the gross estate was found to exceed $311,000, no estate tax return had ever been filed. The court also found that Vince was "careful to keep record title of his property in the names of others." Id. at 755. Although during the IRS investigation concerning estate taxes the brothers denied that Vince left any estate, the court found that Vince entirely owned the stock in both Valley Land, Inc. (VLC), a duplex-rental operation, and Cicero's, a restaurant and bar, and owned a majority interest in National Cigarette Service, Inc. (NCS), a vending service corporation. Id. at 754-55 n. 1. The trial judge in the criminal case found that the DeNiro brothers agreed "to gather together and secure permanent possession of these and all other properties which had belonged to their deceased brother to the exclusion of his rightful heirs,"[2] the brothers' nieces. Id. at 756. In short, the DeNiro brothers appropriated VLC and NCS and all the assets represented by these corporations after Vince DeNiro's death. The district judge also found that, to cover their conspiracy and the appropriation of their nieces' properties, the DeNiro brothers lied to IRS investigators and forged ownership papers. For reasons not discernible, however, the district judge imposed as punishment only a relatively modest fine and probation.[3] Not until September 1977 were decedent's daughters appointed co-administratrices of decedent's estate by the Mahoning County, Ohio, Probate Court. That action followed another opinion by this court dealing with another aspect of the affairs of the estate. See DeNiro v. United States, 561 F.2d 653 (6th Cir.1977).
 
 
 3
 This appeal involves income taxes allegedly due from the estate, represented by the official representatives and by the DeNiro brothers as transferees. The tax court upheld assessments of income tax against the estate for the year 1969 and additions to the tax for failure to file a return in that year. See Estate of DeNiro v. Commissioner, 44 T.C.M. (CCH) 981 (1982). It found as follows:
 
 
 4
 During 1969, petitioner owned 65 percent of the stock of NCS and 100 percent of the stock of VLC. At all times relevant hereto, however, the DeNiro brothers controlled the operations of both NCS and VLC .... Frank DeNiro, Jr., was the president of both NCS and VLC, and Louis DeNiro was secretary-treasurer of NCS. NCS was in the business of operating vending machines, and VLC was in the business of owning and operating rental apartments.
 
 
 5
 On or about April 9, 1969, respondent made jeopardy assessments for estate tax, addition to tax, and interest of $1,188,000 against petitioner and the DeNiro brothers, as transferees of the estate. Respondent also filed and recorded Federal tax liens against petitioner, the DeNiro brothers, as transferees of the estate, and Cicero's, Inc., NCS, and VLC, as nominees of the estate. No assessments were made against the corporations.
 
 
 6
 On or about May 9, 1969, Frank DeNiro, Jr., Louis DeNiro, Michael DeNiro, Samuel Karam, their attorney, Jack Marmagin, the accountant for NCS, and Anthony Davanzo, the accountant for VLC, attended a meeting with two Internal Revenue Service attorneys, Bernard Friedlander (now deceased) and Michael Ruggieri. At this meeting, the DeNiro brothers signed a Form 890 (Estate Tax Waiver of Restriction on Assessment and Collection of Deficiency and Acceptancy of Overassessment) consenting to the assessment and collection of an estate tax deficiency of $81,000, plus interest thereon. Subsequently, respondent made a partial abatement of the original jeopardy assessments and the amount of the assessment remaining after abatement, $104,577.04, was paid by NCS and VLC in 1969.
 
 
 7
 NCS and VLC paid $89,257.04 and $15,320, respectively, of the assessment. The payment made by VLC represented proceeds of an insurance claim filed by VLC with respect to fire damage to one of its apartment units, while NCS borrowed $69,757.04 of the amount it paid. After NCS and VLC paid the assessment, respondent released the Federal tax liens he had filed against petitioner, the DeNiro brothers, Cicero's, Inc., NCS, and VLC.
 
 
 8
 Id. at 982.
 
 
 9
 NCS filed a refund claim in 1972 based on its position that it should be entitled to a deduction for the $89,257 payment. The tax dispute arising out of this claim was finally settled in 1979. VLC filed a similar claim for a $15,320 deduction, but this was denied. These corporations together with the DeNiro brothers filed a refund suit in the district court in 1974 claiming that the $104,577.04 payment by the corporations was an overpayment of estate taxes. NCS and VLC were dismissed as plaintiffs, and a jury found in 1975 that the DeNiro brothers were entitled to a $57,155.73 refund. See DeNiro v. United States, 36 A.F.T.R.2d p 148,028 (N.D.Ohio 1975), modified, 561 F.2d 653 (6th Cir.1977). According to the unchallenged tax court finding, "[t]his judgment was later amended to provide for a refund of $61,613" to take into account a deduction for attorney's fees. 44 T.C.M. (CCH) at 983. An appeal was taken from that amended judgment, and this court allowed the refund,[4] observing, "The [district] court reasoned that the persons on whose behalf the payments were made were 'taxpayers' who were entitled to sue for refund." 561 F.2d at 656. This court found, moreover, that "the evidence in the present case is consistent with" prior findings that the DeNiros conspired to and did appropriate unto themselves "all the assets of Vince DeNiro's estate." Id. It was stipulated that this included 100% of VLC and at least 65% of NCS. Although neither corporation had appealed the district court's dismissal of it as a party, this court stated that the corporations would have had standing to challenge the payments because they were made to avoid the liens and were therefore involuntary. This court held, however, that the DeNiros had standing individually as de facto "executors" of the estate to pursue the refund of the overpaid estate taxes because the payments from the corporations constituted constructive dividends to the estate, giving the estate standing to sue for any tax overpayment. See id. at 657. The government's argument in this case that the payments constituted constructive dividends to the estate is therefore consistent with this court's 1977 decision.
 
 II.
 
 10
 Petitioners argue that the tax court erred in characterizing the payments at issue here as constructive dividends to the estate. They urge alternatively that the payments were loans or were made for business purposes. They also argue that NLS had insufficient earnings and profits to pay a dividend of $89,257.
 
 
 11
 Receipt of a dividend constitutes gross income under I.R.C. Sec. 61(a)(7); and a dividend is defined under id. Sec. 316(a) as "any distribution of property made by a corporation to its shareholders" out of certain funds. Although VLC and NCS may not have intended that the tax payments be considered a dividend, and did not treat these payments as dividends on their books, this does not prevent the payment from being considered a constructive dividend. See Loftin & Woodard, Inc., v. United States, 577 F.2d 1206, 1214 (5th Cir.1978); Sachs v. Commissioner, 277 F.2d 879, 882-83 (8th Cir.), cert. denied, 364 U.S. 833, 81 S.Ct. 63, 5 L.Ed.2d 59 (1960). We agree with the tax court that "the corporation's payment of the estate tax conferred an economic benefit" upon the estate, and "[t]he estate tax was petitioner's and not the corporations' liability," since no assessment was made against the corporations. 44 T.C.M. (CCH) at 984.
 
 
 12
 Whether a payment is a loan as opposed to a dividend is a factual question, and the tax court's judgment is entitled to deference. See Wilkof v. Commissioner, 636 F.2d 1139, 1140 (6th Cir.1981) (per curiam). While the DeNiro brothers testified that the payment of VLC was intended as a loan, the tax court completely discredited their testimony. Questions of intent involve factual determinations to be made by the tax court, and the tax court judge simply did not believe the DeNiro brothers, who were convicted felons, had previously lied to IRS agents, and had committed fraud upon their minor nieces. A court need not accept testimony, even if unrebutted, where the circumstances surrounding the transactions involved do not lend credence to that testimony. See Lovell & Hart, Inc. v. Commissioner, 456 F.2d 145, 148 (6th Cir.1972) (per curiam) (the tax court "is not bound to accept testimony at face value even when it is uncontroverted if it is improbable, unreasonable or questionable") (quoting Commissioner v. Smith, 285 F.2d 91, 96 (5th Cir.1960)).
 
 
 13
 The tax court concluded that, "[p]rior to March 1978, neither NCS nor VLC had ever attempted to recoup any portion of their payments other than through their participation in the refund litigation." 44 T.C.M. (CCH) at 984-85. No clear or contemporary book entry was made by VLC to indicate that the payment was a loan.[5] No note or formal evidence by way of a separate loan document was executed, no security was given or demanded, and no interest was claimed or paid. We concur with the tax court's conclusion that "these facts militate strongly against a finding that NCS or VLC ever expected to be repaid." Id. at 985. We therefore cannot find the tax court's finding in this regard clearly erroneous.
 
 
 14
 Petitioners contend the payments by both VLC and NCS should not be considered constructive dividends because the corporations undertook the payments to protect their own business interests. The estate further argues that the imposition by the IRS of liens on the corporate assets imperiled the corporations' very existences. Dicta in this court's 1977 DeNiro decision supports this contention and the contention that the payments were not voluntary. See supra p. 330. But see id. (court held that payments constituted dividends). Therefore, petitioner argues that the payments should be treated as corporate business expenses rather than income to the estate under Parker v. Commissioner, 365 F.2d 792, 800-01 (8th Cir.1966), cert. denied, 385 U.S. 1026, 87 S.Ct. 752, 17 L.Ed.2d 674 (1967).
 
 
 15
 The appropriate standard to apply in determining whether payments of this sort amount to constructive dividends was enunciated in Loftin, 577 F.2d at 1215, where the court held that distributions of this sort should be deemed constructive dividends if they are made for the primary purpose of benefiting the shareholder. The court in Sammons v. Commissioner, 472 F.2d 449, 452 (5th Cir.1972), termed this analysis a "subjective requirement." The fact-finding of the tax court in this respect is entitled to great deference; it should be upheld unless clearly erroneous. See Loftin, 577 F.2d at 1215; Wilkof, 636 F.2d at 1140.
 
 
 16
 We do not believe that the tax court's findings regarding the purpose for the payments was clearly erroneous despite the testimony of the DeNiro brothers that the payments were made with a primary business purpose in mind. The tax court was free to discredit this testimony. See supra pp. 330-331. That court stated that
 
 
 17
 most of the support for petitioner's position rests upon the testimony of Frank and Louis DeNiro. Unfortunately, we found both Frank and Louis to lack credibility and cannot accord any weight to their testimony. At trial, they testified that the liens filed against the corporations resulted in adverse publicity which prevented NCS from obtaining credit from its regular sources. Even if we believed such testimony, the record does not indicate that NCS required regular financing to conduct its business. Nor is there any evidence which shows that the financial institutions that purportedly refused to extend credit to NCS constituted a regular source of financing for the corporation.
 
 
 18
 44 T.C.M. (CCH) at 986 (emphasis added).
 
 
 19
 The tax court concluded that the estate had
 
 
 20
 simply failed to prove that the liens filed against NCS and VLC posed a real threat to their business. While the payment of the estate tax incidentally benefited the corporations through the removal of the tax liens, we believe that the payment primarily advanced petitioner's interests. The corporations were not directly liable with respect to the payment of any portion of the estate tax; the fact that the nominee liens may have attached to the assets of the decedent, if any, held by the corporations does not require us to conclude otherwise....
 
 
 21
 We hold that NCS's and VLC's payment of the assessment made against petitioner for its estate tax liability constituted a taxable dividend to the extent of the respective earnings and profits of each corporation.
 
 
 22
 Id. at 987.
 
 
 23
 We affirm the tax court's conclusions as being based upon substantial evidence. This result is also compelled, we believe, by this court's rationale in its 1977 DeNiro opinion. The record before this court in 1977 did not include the testimony of IRS attorney Ruggieri, found here by the tax court to be a "candid and credible witness," 44 T.C.M. (CCH) at 986, that the IRS did not threaten to padlock NCS or to take over VLC if Louis DeNiro and his brothers refused to accept a proposed tax deficiency against the estate. The basis for this court's dicta that the corporate payments were involuntary was that Louis DeNiro's testimony to that effect was "without contradiction."[6] 561 F.2d at 656.
 
 
 24
 In addition, the tax court found as a fact that, contrary to the DeNiro's assertions, the IRS representatives, at a conference with the DeNiro brothers following the filing of a lien on the corporate properties, did not threaten to padlock the doors of the corporations or to terminate their operations. Rather, it found that the purpose of the meeting was to determine the fair market value of the estate assets. See 44 T.C.M. (CCH) at 986. Even if the corporate payments were not voluntary and were induced in considerable measure by the pressure of liens against VLC and NCS properties, we conclude that the primary purpose was to benefit personally the DeNiro brothers, who had arrogated to themselves the estate assets and refused to make any accounting for them for estate or inheritance tax purposes or otherwise.
 
 
 25
 Whether the corporations had another available legal remedy besides arranging and paying the tax, as the tax court asserted they did under 28 U.S.C. Sec. 2410, need not be decided. This was not a principal basis for the court's factual findings and conclusion that the tax payments were constructive dividends to the estate and thus subjected it to income tax liability in 1969.
 
 
 26
 Having decided that the corporate payments were not made for a primary business reason, we must next determine the extent of the earnings and profits of NLS[7] at the time of the payment as a potential limiting factor in the amount subject to income tax in 1969. A corporation can distribute a dividend only when its earnings and profits are sufficiently large to allow the payment to come from that category. See I.R.C. Sec. 316(a). Otherwise, a distribution to a stockholder is merely a recovery from his basis in his shares to the extent that he has such a basis; to the extent that the payments exceed the basis, the payments amount to a gain. See id. Secs. 316(a), 301(c). Petitioners argue that the earnings and profits available for payment of dividends from NCS were less than the $89,257.04 payment. Petitioners point out that NCS borrowed $69,757.04 of the $89,257.04 that it paid. They contend that the current earnings and profits of National Cigarette would permit $41,762.99 to be taxable as ordinary income and $6,544.05 as capital gain, because the estate's basis in NCS stock was $40,950, and $41,762.99 was reflected by NCS's accountant to be the adjusted net income after provision for income taxes for the period ending as of the date of the tax payment, September 17, 1969. The tax court held that the evidence was "insufficient to establish the accumulated earnings and profits of either corporation," and "since petitioner has failed to prove the amount of either corporation's earnings and profits, we must sustain respondent's determination that petitioner had taxable income of $104,577.04 as a result of the payments by NCS and VLC." 44 T.C.M. (CCH) at 987. The commissioner's deficiency determination is presumed to be correct, and the taxpayer has the burden of showing error in the determination. Helvering v. Taylor, 293 U.S. 507, 515, 55 S.Ct. 287, 290, 79 L.Ed. 623 (1935).
 
 
 27
 The problem with petitioners' position concerning NCS is that while there is a purported deficit in accumulated earnings and profits as of January 1, 1969, claimed to be $96,335, substantial taxable income is reflected for the years 1966, 1967, and 1968, as well as in 1969 if the estate tax payment is deemed not deductible. See Jt.App. at 184. It is difficult to reconcile the claim of accumulated deficit with a consistent pattern of earnings from 1966 through 1969.
 
 
 28
 In reaching its conclusion, however, the tax court was cryptic. It stated, "the evidence contained in the record is insufficient to establish the accumulated earnings and profits of either corporation." 44 T.C.M. (CCH) at 987. The tax court did not say why the exhibits and the accountant's testimony, substantially unrebutted, were "insufficient" as to NCS; it simply reiterated the above statement and added, "petitioner has failed to prove the amount of either corporation's earnings and profits." Id. The tax court therefore did not address the Commissioner's argument that payment of the estate tax liability by NCS constituted ordinary income to the estate "regardless of whether the corporations had sufficient earnings and profits to make the payment taxable as constructive dividends." Id. at 987 n. 6.
 
 
 29
 We conclude that this matter should be remanded to the tax court for further consideration and a more specific determination about the sufficiency or insufficiency of the earnings and profits of NCS. If, upon reconsideration, the tax court concludes that NCS's contention is correct at least in part and that some portion of the $89,257 considered as a constructive dividend should be treated as a reduction in basis, it should so indicate and set forth how the sum should be allocated. If the tax court considers that the evidence is insufficient to support the petitioners' contention, it should set out in what respect petitioners have failed to meet the necessary criteria to establish the amount of 1969 earnings and profits. It may also consider further the Commissioner's argument that the entire payment by NCS is taxable as income to the estate regardless whether it is considered a constructive dividend under the rationale of Davis v. United States, 226 F.2d 331 (6th Cir.1955), cert. denied, 350 U.S. 965, 76 S.Ct. 432, 100 L.Ed. 838 (1956), Weir v. Commissioner, 283 F.2d 675 (6th Cir.1960), and United States v. Goldberg, 330 F.2d 30, 38 (3d Cir.), cert. denied, 377 U.S. 953, 84 S.Ct. 1630, 12 L.Ed.2d 497 (1964). Cf. DiZenzo v. Commissioner, 348 F.2d 122, 125-27 (2d Cir.1965).
 
 III.
 
 30
 Finally, we conclude that the estate was liable for a 26 U.S.C. Sec. 6651(a) addition to tax, as determined by the tax court. The estate filed no return for the year 1969. Although the tax court conceded that it was unclear whether anyone actually "represented the decedent's estate in a fiduciary capacity at the time its return for 1969 was required to be filed," 44 T.C.M. (CCH) at 988 n. 8, the DeNiro brothers then clearly possessed and controlled the corporations and the estate assets. As pointed out by the tax court, moreover, it is not reflected in the record that the DeNiro brothers relied on VLC and NCS accountants for advice concerning the estate and its tax liability. See id. at 988. The standard to be applied is whether the tax court was clearly erroneous in finding that no consideration was given by petitioners (or any individuals acting on the estate's behalf) or by the corporate accountants to the taxability of the VLC and NCS payments to the estate.
 
 
 31
 The question of the existence of reasonable cause is in the first instance one of fact for the Tax Court, Commissioner v. Lane-Wells Co., 321 U.S. 219, 225 [64 S.Ct. 511, 514, 88 L.Ed. 684 (1944) ] ... which must decide whether the elements which constitute reasonable cause are present in a case. What elements must be presented to constitute reasonable cause is a question of law. Hatfried, Inc., v. Commissioner, 3 Cir. [1947], 162 F.2d 628, 635; Haywood Lumber & Mining Co. v. Commissioner, 2 Cir. [1950], 178 F.2d 769.
 
 
 32
 Re Fisk's Estate, 203 F.2d 358, 359 (6th Cir.1953). The tax court itself has put the standard this way:
 
 
 33
 Whether a failure to file a return was due to reasonable cause is essentially a question of fact and the burden of proof is upon the petitioner. Coates v. Commissioner, (C.A. 8 [1956] 234 F.2d 459, affirming a Memorandum Opinion of this Court, and Beck Chemical Equipment Corporation [v. Commissioner], 27 T.C. 840.
 
 
 34
 Shomaker v. Commissioner, 38 T.C. 192, 202 (1962).
 
 
 35
 The tax court looked at the elements of reasonable cause in the context of reliance upon professional tax advice that were mentioned in Haywood Lumber & Mining Co. v. Commissioner, 178 F.2d 769 (2d Cir.1950), a case cited by this court with approval in Re Fisk's Estate, and determined that there had been no adequate showing by petitioners as to the competency of the corporate accountants, or that they were given all the pertinent facts concerning the status of the estate. While the DeNiro brothers themselves may not have been familiar with the tax implications of a constructive dividend, the burden was upon them as "de facto executors" or upon Vincent DeNiro's daughters as co-administratrices to demonstrate reasonable cause for the failure to file an income tax return on behalf of the estate. We cannot conclude that the tax court committed clear error in deciding that petitioners did not carry this burden. It was, therefore, proper for the Commissioner to assess the additional tax, which has "the remedial character of sanctions ... provided primarily as a safeguard for the protection of the revenue and to reimburse the government for the heavy expense of investigation." Helvering v. Mitchell, 303 U.S. 391, 401, 58 S.Ct. 630, 634, 82 L.Ed. 917 (1938).
 
 IV.
 
 36
 Accordingly, we affirm the tax court except for the remand to consider and specify the basis for its decision as to whether and to what extent the entire amount of the payment by NCS in 1969 was taxable to the estate as ordinary income.
 
 
 
 [1]
 DeNiro died as a result of a bomb detonation when he endeavored to start his car. United States v. DeNiro, 392 F.2d 753, 754 (6th Cir.), cert. denied, 393 U.S. 826, 89 S.Ct. 89, 21 L.Ed.2d 97 (1968)
 
 
 [2]
 "His lawful heirs were his two children by his former wife, Mary DeNiro." Id. at 754. They "were minors at the time of his death." DeNiro v. United States, 561 F.2d 653, 655 (6th Cir.1977)
 
 
 [3]
 Except in the case of Louis DeNiro, the "ringleader" in the tax evasion activities, a 90-day jail sentence was imposed
 
 
 [4]
 The tax court noted that in 1978 Mrs. DeNicholas and Mrs. Papalia, decedent's daughters, received the ultimate refund of $67,741.33, plus interest, "as fiduciaries of the estate of Vincent DeNiro." Id. at 983. All parties who represent the petitioner estate were also noted by the tax court to have agreed to settle the claims of VLC and NCS against the estate arising out of the corporate payment of estate tax for the "total final judgment" of the estate tax refund. Id. The DeNiro brothers also paid the daughters $30,000 for a release of any claims against them personally. The daughters, in turn, released to the DeNiro brothers their claims to stock ownership in VLC and NCS. See id. at 983-84
 
 
 [5]
 An entry of $15,300, not $15,320, was apparently made at the close of fiscal year 1970 on VLC workpapers to support the claim of a loan. This was, however, as pointed out by the tax court, "denoted a 'loan to officers' rather than petitioner." Id. at 985
 
 
 [6]
 The other IRS representative present, Bernard Friedlander, is deceased. Id. at 982
 
 
 [7]
 Petitioners concede that if the payment by VLC is considered a constructive dividend, "the entire $15,320 paid by Valley Land to the estate would constitute a taxable dividend under I.R.C. Secs. 301 and 316."