USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 93-1365 ALAN E. LEWIS AND HARRIET R. LEWIS, Petitioners, Appellants, v. COMMISSIONER OF INTERNAL REVENUE, Respondent, Appellee. ____________________ ON APPEAL FROM A DECISION OF THE UNITED STATES TAX COURT ____________________ Before Breyer, Chief Judge, ___________ Rosenn,* Senior Circuit Judge, ____________________ and Cyr, Circuit Judge. _____________ ____________________ David R. Andelman with whom Edward F. Fay, Colleen A. Brady and __________________ _____________ _________________ Lourie & Cutler, P.C. were on brief for appellants. _____________________ Kenneth L. Greene, Attorney, Tax Division, U.S. Department of __________________ Justice, with whom Michael L. Paup, Acting Assistant Attorney General, _______________ Gary R. Allen and Curtis C. Pett, Attorneys, Tax Division, U.S. ______________ _______________ Department of Justice, were on brief for appellee. ____________________ March 17, 1994 ____________________ _____________________ *Of the Third Circuit, sitting by designation. BREYER, Chief Judge. Alan and Harriet Lewis ____________ appeal from a Tax Court decision assessing taxes upon $1,062,500, which a Lewis-controlled corporation called "ILT" distributed to the Lewises in 1984. In the Tax Court's view, that money represented an ILT "dividend," paid to the Lewises at that time. See I.R.C. 301(a), (c)(1)- ___ (3) (1986). The Lewises disagree. They point out that a "dividend" must come from a corporation's "earnings and profits." See id. 316(a). And, they argue, ILT had no ___ __ "earnings and profits," either in or before 1984, from which it might have paid a "dividend" in 1984. The Tax Court's contrary conclusion, they believe, rests upon a simple, and clear, factual error. _______ The Lewises further argue that, if ILT's distribution of the $1,062,500 is not a dividend, neither is it any other kind of 1984 taxable "income." See id. 61 ___ __ (defining "gross income" as "all income from whatever source derived"). Rather, in their view, the 1984 distribution represents income that they constructively received in, and accumulated from, earlier years, namely from the years 1974 through 1980. The Lewises concede that they should have ___________ paid (but never have paid) income tax on this money sometime ____ _______________ between 1974 and 1981. But, as all parties concede, the ___ -2- 2 statute of limitations now bars the Commissioner from assessing taxes for those earlier years. And, in the Lewises's view, the Commissioner cannot subvert the letter, and the spirit, of that statute by taxing now income that ___ the government should have taxed then. The Lewises ____ conclude that we should, therefore, simply reverse the Tax Court's determination. In our view, the Lewises are correct about the Tax Court's factual error. The record makes clear that the 1984 distribution did not come from ILT's "earnings and profits." It is, as the Lewises say, some form of accumulated income that the Lewises "constructively received" in prior, and now-closed, tax years. But, whether or not the Lewises must pay taxes on that distribution is a different matter. In adjudicating tax cases, the courts have developed a type of estoppel known as "quasi estoppel" or the "duty of consistency," whereby a taxpayer may not take a position in one year to his advantage, and then at some later point, after correction for that year is barred by the statute of limitations, adopt a contrary position touching on the same facts or transaction. Jacob Mertens, Jr., The Law of ____________ Federal Income Taxation 60.05 (1992). Whether that _________________________ doctrine requires the Lewises to treat the 1984 ILT -3- 3 distribution as taxable income is a matter so far addressed only superficially by the parties and upon which we wish the Tax Court's views. We therefore decline the Lewises's invitation to hold that the $1,062,500 is not taxable to them in 1984, and we remand this case to the Tax Court for further proceedings. I Background Facts ________________ To understand the Tax Court's factual error, one must have in mind a rather complex (and here undisputed) set of events, some of which took place before, and others after, December 1980, when ILT's bank account showed a zero balance. A Before December 1980 ____________________ This case arises out of an effort by Alan Lewis, and Steven Belkin, his business associate, to avoid paying federal income taxes on revenue generated primarily in Europe by their travel business, Trans National Travel ("TNT"). Two key sets of events took place before December 1980. First, between 1974 and 1980, Lewis and Belkin had TNT employees send TNT revenue generated by the sale of local (e.g., European city) tours in Europe to the Cayman -4- 4 Island bank account of ILT, a foreign corporation that they owned and controlled. ILT transferred some of the money ____ received from TNT to two Cayman Island trusts. Those trusts, it later turned out, were "grantor" trusts of Lewis and Belkin (meaning, basically, that Lewis and Belkin should have paid income tax on the money those trusts received when the trusts received it.) Second, and more important for present purposes, between 1977 and 1980 ILT "loaned" the rest of the money ____ received from TNT to two limited partnerships formed and controlled by Lewis and Belkin. In effect, this was money "loaned" by Lewis and Belkin to themselves, for the purpose of making some personal investments. The total amount of these "loans" was approximately $2.075 million. There were three such "loans," each of which involved money that travelled a circuitous path, reaching Lewis and Belkin through paper intermediaries: a) In 1977, ILT loaned $800,000 to Gran Compania De Comercio, which reloaned the money to Windikip Financieringsmaatschappij B.V., which in turn reloaned the money to Charlesgate West Associates. We assume that Gran Compania and Windikip were Lewis/Belkin- controlled entities that existed only on paper (though their use may have avoided the need to withhold U.S. taxes on interest payments). Charlesgate was a Lewis/Belkin real estate partnership, which used the money for the benefit of Lewis and Belkin. -5- 5 b) In 1978, ILT loaned Charlesgate West Associates an additional $600,000, using the same intermediaries. c) In 1980, ILT loaned $675,000 to a Lewis/Belkin-controlled real estate partnership named Taunton Boulevard Associates, which used the money for their benefit. This time the intermediaries consisted of two different foreign entities called "Mido Capital Venture, N.V." and "Bristol Realty Trust." In each instance, the lending entity and all the borrowing entities created all the necessary loan-related documentation. Thus, on paper, it seemed as if Charlesgate owed Windikip (which owed Gran Compania, which owed ILT) regular payments of interest plus repayment of principal. Similarly, it seemed, on paper, as if Taunton owed Bristol (which owed Mido, which owed ILT) regular payments of interest plus repayment of principal. The Tax Court found, however, that neither Lewis nor Belkin, the persons in control of Charlesgate and Taunton Associates, ever intended to pay back the $2.075 million in "loans" to ILT. Hence, for tax purposes, they were not loans at all. By the end of 1980, ILT apparently had paid out all the TNT money it had received either 1) to the Lewis/Belkin "grantor" trusts, or 2) to the Lewis/Belkin real estate partnerships by way of the $2.075 million -6- 6 Charlesgate and Taunton loans. As we have said, the Tax Court found that, as of December 31, 1980, ILT's bank balance was zero. -7- 7 B After 1980 __________ Three significant events occurred after 1980. First, in 1983, Belkin and Lewis ended their business association. As part of their consequent efforts to divide property jointly owned or controlled, they decided to repay the three "loans" from ILT. They therefore reversed the "money flow," having (in the one case) Gran Compania (paid by Windikip, paid by Charlesgate) pay ILT $1.4 million, and (in the other case) Mido Capital (paid by Bristol Realty, paid by Taunton) pay ILT $708,658. Second, ILT, having received this money (plus related interest) from Gran Compania and Mido, divided it in half, distributing $1,079,329 to Belkin's "grantor" trust and $1,079,329 to Lewis's "grantor" trust. The adjusted amount ($1,062,500) of this distribution to Lewis's "grantor" trust in 1984 (which, as noted above, amounts for tax purposes to a distribution to Lewis himself) is the money at issue here. II The Tax Court's Error _____________________ The factual record, as just described, suggests that the underlying, and possibly difficult, question in -8- 8 this case is not one of finding the facts, but rather, one of characterizing facts that are essentially beyond dispute. ______________ Is ILT's 1984 distribution of roughly $2.159 million taxable "income" to its recipients in light of the fact that that distribution originated in the repayment of sham loans (made __________ in years now closed to review), the funds for which "loans," in turn, originally took the form of what may have been taxable (but untaxed) income to those same recipients (again, in years now closed to review)? The Tax Court avoided this question, however, by finding as fact that ILT had other "earnings and profits" out of which its 1984 _____ distribution could have been made. The Tax Court found that between 1981 and 1984, unidentified amounts were deposited into and/or credited to ILT's Cayman Islands bank account in the approximate amount of $4.5 million. Since the law presumes that a corporate distribution comes from "earnings and profits," leaving the taxpayer to show the contrary, see Hagaman v. Commissioner, 958 F.2d 684, 695 ___ _______ ____________ n.16 (6th Cir. 1992) (citing cases), were it true that $4.5 million in "unidentified amounts" were (between 1981 and 1984) "deposited into and/or credited to ILT's Cayman Islands bank account," the law would simply presume that the -9- 9 $2.159 million payment in 1984 was a "dividend." (This is so because $4.5 million minus the $2.159 million loan repayment would still have left ILT with $2.341 million in "earnings and profits" -- enough to support a $2.159 million dividend.) And, the Lewises would have to pay taxes upon that dividend income. Unfortunately for the Commissioner, the record makes clear that it is not true that ILT had some other ___ _____ significant source of income. The 1981-1984 ILT bank account deposits are fully explained; and, ILT did not have $4.5 million in "earnings and profits," accumulated or otherwise. The Tax Court's finding to the contrary is "clearly erroneous." See, e.g., Hagaman, 958 F.2d at 690 ___ ____ _______ (Tax Court's findings accepted on appeal unless "clearly erroneous"). We reach this conclusion because Lewis himself testified, without contradiction, that ILT had no other _______ _____________ income. He said that ILT was formed to serve as a tax- saving entity for TNT's "local tour" money (in other words, that ILT was a sham corporation), that the transfers of that "local tour" money constituted ILT's sole significant source ____ of "income," and that TNT did not transfer any money to ILT ___ after 1980. Lewis's testimony is supported by the Tax -10- 10 Court's own explanation of the workings of the Lewis/Belkin tax avoidance plan, which fully accounts for the money that ILT received. Nothing in that explanation suggests that ILT had some other source of income. _____ Finally, and most important, the Commissioner introduced into evidence (over the Lewises's objection) ILT's 1981-1984 bank account records. Those records confirm that ILT's income during that period consisted of 1) interest paid on the Charlesgate and Taunton "loans," 2) interest earned on the account balance, and 3) the return of the Charlesgate and Taunton "loan" principals in 1984. (We attach that exhibit as an Appendix here.) The Lewises in their brief go through each entry, showing how it falls into one of these three categories (with the exception of two bank errors -- a deposit notation of $1.415 million (4/26/84), reversed the same day, and a deposit notation of $37,625 (5/25/84), reversed about one month later). Their explanation is supported by the facts that 1) the bank statement shows large deposits in the very "loan return" amounts that the Tax Court mentions, 2) many smaller deposits refer to "Mido" or "Gran Compania," the entities that should have paid ILT interest on the loans, 3) the other deposits, totalling roughly $2.7 million, bear -11- 11 references of "from fixed [or 'call'] deposit," which is how banks sometimes label redeposits from interest-bearing instruments, and 4) the Lewises, in their amended tax returns for 1983 and 1984, described the interest payments as "interest" and paid taxes on them. Not a word in the record, or in the Commissioner's brief, casts doubt upon the Lewises's explanation of the record of ILT's account activity. To understand the Lewises's explanation of the transfers to, and redeposits from, certain interest-bearing instruments labelled "fixed" or "call" "deposit," consider the following hypothetical example. Suppose a depositor instructs a bank to take money from his account and invest it in an interest-bearing instrument (contained, or not contained, in a separate interest-bearing account), and to "roll over" the investment from time to time as the interest-bearing instrument expires. Suppose, for example, that on January 1, John Smith deposits $10,000 in the local bank, along with an instruction to invest the money in Treasury Bills that expire every three months and that pay an annual interest of 5%. Smith's bank statement might look something like this: Date Deposit Withdrawal Balance ____ _______ __________ _______ -12- 12 Jan 1 10,000 10,000 Jan 1 10,000 (to T'bills) 0 March 31 10,125 (from T'bills) 10,125 April 1 10,000 (to T'bills) 125 June 30 10,125 (from T'bills) 10,250 July 1 10,000 (to T'bills) 250 -13- 13 Sept 30 10,125 (from T'bills) 10,375 Oct 1 10,000 (to T'bills) 375 Dec 31 10,125 (from T'bills) 10,500 The Commissioner might use this kind of bank statement as evidence that Smith had interest income of $500, or even as evidence that Smith had income of $10,500 (if the source of the initial $10,000 deposit is not otherwise explained). But, we do not see how the Commissioner -- or, as in this case, the Tax Court -- could add up all the deposits and then use this statement as evidence that Smith had income of $50,500. The statement shows the contrary. In our view, ILT's bank account, in respect to its "fixed/call deposit" references, is that of our hypothetical. The Lewises say in their brief that the back- and-forth transfers of money between ILT's account and "fixed [or 'call'] deposit" represent intra-account _____________ transfers to and from the "checking" and "investment" portions of the single account. This explanation makes sense given what we understand about standard banking activity (i.e., "fixed deposit" may denote a fixed-term, ____ interest-bearing certificate of deposit, and "call deposit" may denote an interest-bearing instrument, say an investment -14- 14 in a money market fund, which can be recalled on demand of the depositor). Moreover, nowhere does the government deny _______ that these transfers of money were short-term investments of the kind just described. In essence, the government concedes the point. The government argues that the Lewises should lose, even if their bank deposit explanation is believed, because they did not advance that explanation at the Tax Court's initial proceeding. The Lewises did advance that ___ explanation, however, in a motion for reconsideration, immediately after they saw what the Tax Court had written. One can meet a burden of proof without disproving, in advance, all logical alternative possibilities. It seems reasonable for them not to have made an issue of the matter earlier, and to have assumed that the government and the Tax Court would read a bank deposit statement in accordance with ordinary commercial banking practices. Of course, one might wonder how we can be so certain that the Lewises are right about the meaning of the bank deposit statement. The truthful answer is that we cannot be completely certain, for we are not experts in __________ banking practices. But, the Lewises's explanation is plausible; it is consistent with what we know of the -15- 15 commercial world; and, the government could easily have provided a counter-explanation, grounded in accounting or banking principles, were the Lewises's explanation wrong. The government failed even to advance a contrary argument. If we put the matter in terms of "burdens of proof," the Lewises satisfied that burden, initially through testimony that would have proved sufficient had the IRS and the Tax Court read the bank deposit statement as reflecting ordinary banking activity; and, then, through a rehearing motion with a full, and uncontroverted, explanation of the statement. If we put the matter in practical terms, we recall Abraham Lincoln's famous question and reply. Lincoln asked his cabinet members, "How many legs would a sheep have if you call a tail a leg?" "Five," they answered. "Wrong," said Lincoln, "the answer is four; calling a tail a leg does not make it one." In sum, the record here shows that Lewis explained the sources and amounts of ILT's income at trial. Nothing in the record suggests that his unrebutted testimony was "improbable, unreasonable, or [even] questionable," such that the Tax Court could choose to disregard it. See Estate ___ ______ of DeNiro v. Commissioner, 746 F.2d 327, 331 (6th Cir. 1984) _________ ____________ -16- 16 (citing Commissioner v. Smith, 285 F.2d 91, 96 (5th Cir. ____________ _____ 1960)). And, ILT's bank statement supports that testimony. ILT did not have "unexplained deposits . . . in the ___ approximate amount of $4.5 million." Insofar as it rests upon this factual error, the Tax Court's finding that ILT had "earnings and profits" in 1984 sufficient to support a $2.159 million "dividend" distribution is "clearly erroneous." III Proceedings on Remand _____________________ Our conclusion about the facts of this case returns it to where we believe it should have begun. How, for tax purposes, should one characterize the funds that flowed to, and then through, ILT in 1984? Some of those funds represent "interest" payments to ILT. The Lewises agree that they must pay income tax on the 1984 distribution to the extent that ILT received any such interest. But, those sums account for only a small part of the distribution. The more important part consists of ILT's receipt and subsequent return to Lewis and Belkin (through their "grantor" trusts) of the $2.159 million in sham loan proceeds. -17- 17 The Tax Court seemed to find that this undisputed transfer of funds to ILT reflected possible ILT "earnings and profits," for it said that Petitioners have failed to show . . . how a transfer between separate taxable entities, i.e., a transfer from petitioner and Belkin to ILT, would not be includable in ILT's taxable income or in ILT's earnings and profits. But, the question at issue here is not factual; it is legal. _____ The Lewises did show, and indeed, the Tax Court acknowledged, what the transfer consisted of, as a matter of fact. It consisted of an effort by Lewis and Belkin to send ____ themselves some money in the manner described in Part I of this opinion, namely, by repaying "loans" obtained from ILT several years before, and flowing the repayment through ILT to themselves (in the form of their "grantor" trusts). The Lewises themselves now concede that the original "loans" were shams. They now dispute, not the facts, but how to characterize them as a legal matter. That is, they deny the Commissioner's legal right to tax in 1984 money that should have been taxed earlier, in now-closed years. The law either does, or does not, permit the government to tax this money now. The taxpayer has no greater burden of "proving" the law than does the Commissioner, or, for that matter, the courts. Our problem -18- 18 is that neither the Tax Court, nor the Commissioner, seems thoroughly to have considered a portion of the law that may answer the legal question. Our own research has led us to conclude that a type of estoppel known as "quasi estoppel" or the "duty of consistency" might operate in a way as to _____ prevent the Lewises from denying the taxability, in 1984, of the $1,062,500 distribution. This "duty of consistency" prevents a taxpayer who has already had the advantage of a past misrepresentation -- in a year now closed to review by the government -- from changing his position and, by claiming he should have paid more tax before, avoiding the present tax. See Beltzer v. United States, 495 F.2d 211, ___ _______ _____________ 212-13 (8th Cir. 1974). The "duty of consistency" seems to apply when the earlier taxpayer position amounts to a misstatement of fact, not of law. See, e.g., Herrington v. Commissioner, 854 F.2d ___ ____ __________ ____________ 755, 758 (5th Cir. 1988), cert. denied, 490 U.S. 1065 _____________ (1989); Beltzer, 495 F.2d at 213; Mayfair Minerals, Inc. v. _______ ______________________ Commissioner, 456 F.2d 622, 623 (5th Cir. 1972); Crosley ____________ _______ Corp. v. United States, 229 F.2d 376, 380 (6th Cir. 1956); _____ _____________ Ross v. Commissioner, 169 F.2d 483, 496 (1st Cir. 1948) _____________________ (simple failure to report income "is not a representation that such income has in fact not been received" and does -19- 19 not, without more, furnish grounds for estoppel); Mertens, _______ supra, 60.05 ("Where there is a mistake of law and no _____ factual misrepresentations, the doctrine of consistency does not apply."). Moreover, the misstatement must be one on which the government reasonably relied, in the sense that it neither knew, nor ought to have known, the true nature of the transaction mischaracterized by the taxpayer. See ___ Herrington, 854 F.2d at 758; Mayfair Minerals, 456 F.2d at __________ ________________ 623; Ross, 169 F.2d at 495-96. ____ In this case, it seems possible that Lewis made representations of key facts regarding the genuine business activities of ILT throughout the 1970's and the genuine intent on his and Belkin's part to repay the ILT "loans." If such representations of fact were made, then holding Lewis to them now might generate a 1984 tax liability. We stress, however, that we are uncertain about this matter. Since it has not been argued here, and since factual history is at issue, both the Lewises and the Commissioner should have a full opportunity to argue the issue before the Tax Court. We therefore vacate the Tax Court's judgment insofar as it is inconsistent with this opinion. And, we remand the case to the Tax Court for further proceedings. -20- 20 So ordered. __________ NOTE: See Slip Opinion for Appendix. -21- 21