MARGARET R. FOLEY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Foley v. Commissioner
Docket No. 16573-87
United States Tax Court
T.C. Memo 1995-16; 1995 Tax Ct. Memo LEXIS 16; 69 T.C.M. (CCH) 1661; January 17, 1995, Filed *16 Decision will be entered for petitioner. For petitioner: Ernest D. Defoy and Walter McCrary (specially recognized). For respondent: Donza M. Poole. COLVIN
COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION COLVIN, Judge: Respondent determined a $ 29,349.17 deficiency in petitioner's 1982 Federal income tax and additions to tax for negligence under section 6653(a) and for substantial understatement of tax under section 6661; and increased interest under section 6621(c) for substantial underpayment due to tax-motivated transactions. Petitioner concedes the adjustments in the notice of deficiency. The sole issue for decision is whether petitioner is an innocent spouse under section 6013(e). We hold that she is. Section references are to the Internal Revenue Code in effect for the year in issue. Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated and are so found. 1. Petitioner and Her Family
Petitioner resided in Shaker Heights, Ohio, when she filed her petition. She received a bachelor of arts degree from Trinity College in Washington, D.C., in 1958. She pursued graduate studies at the University *17 of Montpellier in France during 1958 and 1959 and at the University of Miami, Coral Gables, Florida, during 1961. Petitioner taught elementary school in Florida in 1960. She also taught French at a college in Florida while taking graduate courses in French. She worked for Pan American World Airways 1 year in New York City and later in California. Petitioner married Francis Kevin Foley in 1966. Petitioner's husband was an investment counselor and stockbroker when he and petitioner married. Petitioner's husband handled all of the family's business affairs and did not discuss any of his business ventures with petitioner. From 1966 to 1968, petitioner was a French teacher in Ohio. She stopped working in 1969. Petitioner and her husband had three children. Their two daughters were born in 1969 and 1974. Their son, Kevin, Jr., was born in 1970. Petitioner opened a separate checking account from her husband around 1970 because she believed that he was not reliable about handling his account, and she could not tell how much was in his account. She had a separate account thereafter. During the 1970s, petitioner and her husband developed severe marital problems. By the mid-1970s, *18 they rarely, if ever, discussed investments or much of anything else. Petitioner filed for divorce in 1979, but she then attempted to reconcile with her husband. Petitioner began teaching again in the mid-1970s, continuing until the spring of 1981. During 1980 and 1981, petitioner had a part-time job as a tutor for learning disabled students at a private school in Shaker Heights. Petitioner was not employed during 1982. Petitioner took one course per semester for 5 years and received a master's degree in education from John Carroll University in Cleveland in 1981. In the fall of 1981, petitioner began attending law school at night. She started law school because she expected her marriage to fail and she wanted to be prepared to support herself and her children. She attended 4 years at night, and was not employed outside the home during those years. She received a "D" in the only tax course she took. She received her law degree from Cleveland Marshall College of Law in 1985, and was admitted to practice law in Ohio in 1985. Petitioner refiled for divorce in 1985. She and her husband were divorced in November 1985. Petitioner's husband lived at home with her until their *19 divorce. Petitioner's husband was an alcoholic. At the time of trial, petitioner was an attorney with the law firm Massetti & Foley in Cleveland. 2. Petitioner's Son Kevin
Petitioner's son Kevin was born with tubularsclerosis, a rare brain disease that has caused him to be severely mentally retarded. Caring for and dealing with Kevin has been a major part of petitioner's life. Kevin has unprovoked temper outbursts and seizures. He cannot communicate. He lived at home from birth to 1977, which was as long as petitioner could take care of him. From 1977 to 1981 Kevin lived in a special school, Our Lady of the Wayside, in Avon, Ohio, which was about 1 hour from petitioner's home. He came home on weekends. When at home, he was very difficult to care for and entertain. He was very strong. He broke lamps and furniture, started fires, and flooded the bathroom. The family had to keep the doors locked so that he would not run away. He was in the hospital frequently in an effort to find the best medication. In 1981, Kevin was required to leave Our Lady of the Wayside because it could no longer properly care for him. Petitioner traveled all over Ohio to find another home *20 for him. In 1982, petitioner moved Kevin to St. John's Villa in Carrollton, Ohio, which was about 2 hours from petitioner's home. Petitioner spent a great deal of time going to and from Carrollton. Kevin stayed there until 1988. Petitioner then moved Kevin to the Stewart Home School in Kentucky. Petitioner's brother, Walter McCrary (who represented petitioner at the trial in this case), paid $ 47,900 of Kevin's expenses at the Stewart School. The Stewart School sent Kevin home in 1993. At the time of trial he lived in a special home in Cleveland. Petitioner's husband accepted no real responsibility for Kevin. Petitioner's husband did not pay for Kevin's schools. Petitioner and her daughters cared for Kevin when he was home. 3. Petitioner's 1982 Joint Income Tax Return
Petitioner's husband handled their tax return without consulting her. She believed that he was handling their returns correctly. A certified public accountant (C.P.A.), James Flannery (Flannery), prepared the 1982 joint return for petitioner and her husband. Petitioner never talked to Flannery. On the return the Foleys deducted a $ 77,460 net partnership loss related to Barbados No. 2, Ltd., and *21 claimed a $ 5,894 refund. Respondent disallowed the Barbados No. 2, Ltd., partnership loss. Petitioner was trying to reconcile with her husband in the early 1980s, which includes the time when they filed their 1982 return. Petitioner looked at the return before signing it. She saw the $ 77,460 deduction on the 1982 return and asked her husband what it was. He said that it was a common type of tax shelter and that she should sign the return because she did not know anything about tax shelters. Petitioner saw that a C.P.A. had already signed the return. She then signed the return. She knew that it was a deduction for a tax shelter when she signed it, but she did not know any details about what a tax shelter was or have any reason to doubt the deduction was proper. Petitioner does not remember if she filed jointly for 1983. Around 1984, she began to question whether her husband would handle their taxes properly. She talked to her brother, Walter McCrary, who advised her to no longer file a joint return. She filed separately for 1984. 4. Petitioner's Standard of Living
Petitioner and her husband generally had an upper middle income standard of living. Petitioner's *22 husband supported her and her children when petitioner did not work. Members of her family also lent and gave her money. Petitioner's husband generally made the mortgage payments on their house. Petitioner and her husband had a 5-bedroom, 3-1/2-bathroom house in Shaker Heights, Ohio, an upper-income suburb of Cleveland. In 1982 and a few later years, the house needed updating and maintenance such as painting and roof work. In 1982, petitioner had a 1978 Buick station wagon, which she kept until 1985. Her husband had a Thunderbird before 1982, a Cadillac in 1982, a Lincoln Town Car in 1983, a Mustang in 1985, and an MG later. Petitioner did not take vacations with her husband. Petitioner went to a family wedding in Florida in 1983. She went to another family wedding in 1985. She spent a weekend in New York City when her daughter graduated from high school. She and her daughter flew to California using free tickets they got because the airline had overbooked a flight. In 1990, petitioner drove to Florida. Petitioner took no other significant trips. Petitioner's husband went to the Sarajevo Olympics in 1984. In 1984, he took their daughters to New York City and New England. *23 In 1985 he went to Lake Tahoe, took one daughter rafting in West Virginia, and went deep-sea fishing in Florida. He has also taken ski vacations. Petitioner had to use $ 2,000 from her teacher's retirement fund to pay bills in 1983. She had no other separate investments. Petitioner has two brothers and two sisters. Petitioner's family has paid a substantial amount of her expenses over the years. One or more of her four siblings: (a) Lent her the money to attend law school, (b) paid $ 47,900 of Kevin's expenses at St. John's Villa school, and (c) gave her money for household expenses. OPINION 1. Background
Spouses who file joint tax returns are jointly and severally liable for the tax due on their income and related additions to tax. Secs. 6013(d)(3), 6662(a)(2). Petitioner argues that she is not liable for the deficiency and additions to tax or increased interest because she is an innocent spouse under section 6013(e). To prevail, petitioner must prove that: (a) She filed a joint return for the year in issue; (b) there is a substantial understatement of tax attributable to grossly erroneous items of the other spouse on the return; (c) she did not know or have reason *24 to know of the substantial understatement when signing the return; and (d) it is inequitable to hold her liable for the deficiency attributable to the substantial understatement. Sec. 6013(e)(1). Failure to meet any of these requirements precludes a taxpayer from qualifying as an innocent spouse. Shea v. Commissioner, 780 F.2d 561, 565 (6th Cir. 1986), affg. in part and revg. in part T.C. Memo. 1984-310; Estate of Jackson v. Commissioner, 72 T.C. 356, 362 (1979). In view of the congressional purpose of guarding against injustice to innocent taxpayers, we should not read the innocent spouse exception too narrowly. Sanders v. United States, 509 F.2d 162, 166-167 (5th Cir. 1975). Respondent concedes that petitioner meets all of the requirements to be an innocent spouse under section 6013(e) except whether she knew or had reason to know of the understatement when she signed the return and whether it is inequitable to hold her liable. 2. Knowledge or Reason to Know of the Substantial Understatement -- Section 6013(e)(1)(C)
Petitioner must show that she *25 did not know or have reason to know of the substantial understatement attributable to her husband's abusive tax shelter investments when she signed the 1982 return. Sec. 6013(e)(1)(C). a. Actual Knowledge
We first decide whether petitioner had actual knowledge of the understatement when she signed the return. Respondent does not contend that petitioner knew about the understatement when she signed the 1982 return. Thus, we find that petitioner did not have actual knowledge of the understatement when she signed her 1982 return. b. Reason to Know
We must decide whether petitioner had reason to know of the substantial understatement of income tax. Respondent contends that petitioner had reason to know of the understatement caused by the Barbados partnership deduction. We disagree. The Court of Appeals for the Sixth Circuit discussed the standard for reason to know as follows: The test adopted by the Sanders court is the same test advanced by Restatement (Second) of Agency § 9, comment d (1958), which reads as follows: A person has reason to know of a fact if he had information from which a person of ordinary intelligence which such person may have, or *26 of the superior intelligence which such person may have, would infer that the fact in question exists or that there is such a substantial chance of its existence that, in exercising reasonable care with reference to the matter in question, his action would be predicated upon the assumption of its possible existence.
Shea v. Commissioner, supra at 565 (citations omitted). The court said: "The primary ingredients of the 'reason to know' test are (1) the circumstances which face the petitioner; and (2) whether a reasonable person in the same position would infer that omissions or erroneous deductions had been made." Id. at 565-566. The test is whether a reasonable person under the circumstances of the taxpayer at the time of signing the return could be expected to know that erroneous deductions had been made. Id. Significant factors in this decision are petitioner's intelligence, her level of involvement in the financial transactions which gave rise to the deductions, her husband's openness concerning these transactions, and the presence of lavish or unusual expenditures compared to taxpayer's past standard *27 of living. Stevens v. Commissioner, 872 F.2d 1499, 1505 (11th Cir. 1989), affg. T.C. Memo. 1988-63. For reasons stated below, we find that petitioner in her particular circumstances had no reason to know of the understatement. Respondent argues that petitioner is a well-educated individual who had enough information about the transaction at issue to cause her to seriously question the deduction on the 1982 return. Respondent contends that petitioner did not show that her husband's financial affairs were so complex that she could not have discovered the Barbados partnership transaction. We disagree. Petitioner is an intelligent person who persevered through very rough times to take care of her children, while obtaining an education for herself. Her husband was an alcoholic and, apart from paying some of the family's expenses, was of little or no help to her. Petitioner and her husband did not communicate very well. He did not include her in financial decisions. However, he held himself out as a financial expert, and it was reasonable for petitioner to rely on him about financial matters. He did not tell petitioner *28 about the Barbados partnership until she saw the deduction and asked about it. She believed it was a tax shelter, but she had no reason to suspect that it was not valid. Respondent sought to impeach petitioner's testimony by showing she knew the $ 77,460 deduction was a tax shelter and not a business deduction. We fail to see how knowledge that the investment was a tax shelter is fatal to petitioner here. At the time, petitioner knew no details about tax shelters. A reasonable interpretation of the term "tax shelter" in the year at issue to a person unschooled in tax matters was that a tax shelter shelters income from tax. Respondent argues that petitioner's decision to open a separate bank account and her testimony that her husband lived beyond his means shows that she was involved in the family finances. We disagree. Petitioner maintained a separate checking account so that she would know how much money was in the account. Petitioner had limited involvement in the financial affairs of the family, no involvement in her husband's business affairs, and no knowledge of the transaction giving rise to the understatement here. Respondent argues that petitioner should have questioned *29 her husband more or sought the advice of others and refused to sign the 1982 return because she was intelligent, experienced, and believed that her husband was unreliable. However, petitioner was not schooled in financial or tax matters when she signed the return. At the time, she was beginning law school part time at night while she ran the household. Despite his problems, her husband had provided a moderately affluent lifestyle for the family by relying on his financial skills and knowledge. We conclude that petitioner reasonably relied on her husband for financial matters including those which pertain to taxes. If a spouse knows enough facts to be put on notice of the possibility of an understatement, he or she has a duty to inquire further. Guth v. Commissioner, 897 F.2d 441, 444-445 (9th Cir. 1990), affg. T.C. Memo. 1987- 522. A spouse has a duty to question a deduction if a reasonably prudent taxpayer would have reason to believe that the deduction was odd or unusual. Id. A spouse's duty to inquire may be triggered if he or she perceives that anything is wrong with the tax return or that the other spouse is *30 being deceptive. Stevens v. Commissioner, supra at 1507 (taxpayer's husband refused to let her review or to answer her questions about their returns; this triggered a duty to inquire further). Failure to inquire may cause knowledge of the understatement to be imputed to the taxpayer. McCoy v. Commissioner, 57 T.C. 732, 734 (1972); see also Stevens v. Commissioner, supra; Adams v. Commissioner, 60 T.C. 300, 303 (1973). A taxpayer may satisfy the duty to inquire by taking reasonable steps to determine the accuracy of the return, such as by questioning his or her spouse and receiving a plausible explanation. Estate of Killian v. Commissioner, T.C. Memo. 1987-365 (taxpayer who was on notice of the possibility of an understatement took reasonable steps to check its accuracy by questioning her husband, who assured her that a reputable C.P.A. had prepared it). Petitioner asked her husband about the $ 77,460 deduction on the return. Petitioner's husband knew about tax shelters because he was an investment counselor and personally *31 invested in tax shelters. He told her that it was a common type of tax shelter, and that she should not worry about it. Petitioner accepted his explanation. She was further reassured that the deduction was proper because the return preparer had already signed the return when petitioner signed it. Respondent argues that petitioner cannot "harbor doubts about the accuracy of a return and then turn a blind eye toward it." Stevens v. Commissioner, 872 F.2d 1499, 1507 (11th Cir. 1989), affg. T.C. Memo. 1988-63. We disagree with respondent's description of what petitioner did. Petitioner questioned her husband about the $ 77,460 deduction and accepted his response. After his response, petitioner did not harbor doubts about the return. We conclude that petitioner did not know or have reason to know of the understatement. 3. Inequitable to Hold Petitioner Liable
To be entitled to relief as an innocent spouse, petitioner must show that it would be inequitable to hold her liable for the deficiency in tax for the years in issue. Sec. 6013(e)(1)(D). We find that it would. In deciding whether it is inequitable to hold *32 a spouse liable for a deficiency, we take into account whether the purported innocent spouse significantly benefited beyond normal support, either directly or indirectly, from the erroneous deductions. See Belk v. Commissioner, 93 T.C. 434, 440 (1989); Purcell v. Commissioner, 86 T.C. 228, 242 (1986), affd. 826 F.2d 470 (6th Cir. 1987); H. Rept. 98-432 (part 2), at 1501, 1502 (1984); sec. 1.6013-5(b), Income Tax Regs. Normal support is not a significant benefit for purposes of deciding whether it is inequitable to hold petitioner liable for the deficiency. Terzian v. Commissioner, 72 T.C. 1164, 1172 (1979); sec. 1.6013-5(b), Income Tax Regs. Normal support is determined by the circumstances of the taxpayers. Sanders v. United States, 509 F.2d 162, 168 (5th Cir. 1975); Estate of Krock v. Commissioner, 93 T.C. 672, 678 (1989); Flynn v. Commissioner, 93 T.C. 355, 367 (1989). Respondent argues that it would not be inequitable to hold petitioner liable because she testified *33 during her divorce proceedings that she enjoyed a high standard of living. In spite of that testimony, there is no evidence in this case that petitioner received any benefit above normal support. Petitioner and her family lived in a nice home, and her children attended private schools. Petitioner and her husband maintained a standard of living commensurate with her husband's income from his investment counseling and stockbrokerage business. Their lifestyle was not lavish. Petitioner's lifestyle or standard of living did not improve in 1982; in fact she had to increasingly rely on her own savings and her siblings for support. Petitioner did not take trips or receive lavish or expensive gifts in 1982. We do not believe that she benefited significantly from the tax savings from the $ 77,460 deduction. Her husband had a higher standard of living than she did. Respondent argues that petitioner obtained a significant benefit in the assets she received in the divorce settlement. The divorce decree awarded petitioner the marital home and required her husband to pay their 1982 and 1984 income tax liabilities. We think the house was within the bounds of normal support. We do not *34 think requiring petitioner's husband to pay the 1982 and 1984 tax liabilities was a significant benefit because a significant benefit includes only benefits actually received, and petitioner has yet to receive (and may never receive) any benefit from the divorce decree requirement that her husband pay the 1982 and 1984 tax liabilities. Also, we do not think requiring petitioner's husband to pay the 1982 and 1984 tax liabilities was a significant benefit since the liabilities were attributable to his tax shelter investments and because there is no evidence that petitioner's husband can or will pay those taxes. Whether petitioner can compel her husband, who has been unreliable in the past, to pay the 1982 and 1984 taxes is purely speculative. We will not extend significant benefit status to promised or speculative benefits. We find that petitioner did not derive significant benefit from the tax savings caused by the Barbados partnership deduction. Based on the record of this case, we conclude that it would be inequitable to hold petitioner liable for the deficiency in tax. For the foregoing reasons, we hold that petitioner qualifies as an innocent spouse under section 6013(e). *35 To reflect the foregoing, Decision will be entered for petitioner.