T.C. Memo. 1995-576


UNITED STATES TAX COURT


PHILIP H. AND ANNA FRIEDMAN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent[1]


Docket No. 7359-90.        Filed December 4, 1995.


<u>Jay J. Freireich</u>, <u>Harvey R. Poe</u>, and <u>Gerald S. Rotunda</u>, for
petitioners.

<u>Susan G. Lewis</u>, <u>Albert G. Kobylarz</u>, and <u>Guy G. Lavignera</u>,
for respondent.


SUPPLEMENTAL MEMORANDUM FINDINGS OF FACT AND OPINION


GERBER, <u>Judge</u>:  This case has been the subject of three

prior opinions of this Court,[2] the last of which held that Anna

---

[1] This opinion supplements a previously released opinion:
<u>Friedman v. Commissioner</u>, T.C. Memo. 1993-549.

[2] <u>Friedman v. Commissioner</u>, 97 T.C. 606 (1991), concerning
(continued...)

Friedman (petitioner) was not an innocent spouse within the meaning of section 6013(e).[3]  The decision entered following the third opinion was affirmed in part and reversed in part, and the case was remanded to this Court for further proceedings. Friedman v. Commissioner, T.C. Memo. 1993-549, affd. in part and revd. in part 53 F.3d 523 (2d Cir. 1995).

To qualify for innocent spouse relief, a taxpayer must meet all four of the requirements of section 6013(e).  We found that petitioner had shown that she filed a joint return and that a certain tax shelter investment constituted a "grossly erroneous item" within the meaning of section 6013(e).  However, we found that petitioner did not qualify for relief because she failed to meet the third requirement; i.e., the requirement that she did not know and did not have reason to know that the deduction would give rise to a substantial understatement.  Having reached that conclusion, we did not consider whether petitioner met the fourth

---

[2](...continued)
whether "grossly erroneous items" could have been contained on a refund claim, Form 1045, rather than on the Form 1040, within the meaning of sec. 6013(e)(1)(B); Friedman v. Commissioner, T.C. Memo. 1992-89, concerning whether the testimony of an expert witness could be offered to show whether one of petitioners was a truthful witness; and Friedman v. Commissioner, T.C. Memo. 1993-549, which concerned whether Anna Friedman was an innocent spouse within the meaning of sec. 6013(e).

[3] All section references are to the Internal Revenue Code in effect for the taxable period under consideration, and all Rule references are to this Court's Rules of Practice and Procedure, unless otherwise indicated.

test; i.e., whether, under the circumstances, it would be inequitable to hold her jointly liable for the deficiencies.

The U.S. Court of Appeals for the Second Circuit reversed our holding that petitioner failed the third, or knowledge, test as to the tax shelter item only, and remanded the matter to this Court to find additional facts, if necessary, and to decide whether petitioner has shown that, under the circumstances, it would be inequitable to hold her jointly liable for the deficiencies.

### FINDINGS OF FACT[4]

Petitioner met Philip Friedman in 1976 when she was hired as his secretary. They were married in 1979, the year that Philip obtained a divorce from his prior wife. In the course of that divorce, Philip gave almost everything he owned to his first wife. Petitioner was a young widow with two small children and depleted savings at the time of her first husband's death. Petitioner had only a few assets when she married Philip, including a cooperative residence and an automobile.

When petitioners were first married, they lived in a rented apartment in New York, New York, with petitioner's two daughters,

---

[4] By this reference, the facts found in Friedman v. Commissioner, T.C. Memo. 1993-549, are incorporated to the extent that they are in accord with the opinion of the U.S. Court of Appeals for the Second Circuit, which affirmed in part and reversed in part our decision. We repeat some of these findings here, as relevant to the issue now before us. The parties have agreed that we may proceed to find facts and decide this matter on remand based on the existing record and the briefs that have been filed in this Court by the parties.

who were 13 and 17 years old.  At that time, petitioner and Philip were splitting their time between the New York apartment and an apartment in North Miami Beach, Florida.  The New York apartment was in a building with a doorman and a beautiful lobby. The Florida apartment was a two-bedroom unit.

In 1982, petitioners bought a condominium (condo) in Bayside, Queens, New York, because they thought it would be a better environment in which to raise children.  The condo was a three-bedroom, two-bathroom, nicely furnished unit.  One of the bedrooms was converted into an office for Philip.  The condo was purchased jointly, without a mortgage, for $171,000.  The condo was worth $295,000 and had unpaid liens of $290,000 against it at the time of trial.  During 1984 and 1985, the condo had a similar value and outstanding liens of $175,000.  Petitioners hired an interior decorator to decorate the condo in 1982 and again in 1985, spending a total of over $50,000.

Petitioners also owned a home on Fire Island, New York. Philip purchased the land in 1978 and built a three-bedroom house in 1979, all without a mortgage on the property.  That home cost in the range of $74,000 to $79,000 and had a value of approximately $200,000 at the time of trial.  Philip transferred the Fire Island property to petitioner, as sole owner, in 1980. An equity loan and $150,000 mortgage were taken on the Fire Island house by petitioner in January 1991, and Philip was

jointly liable for the mortgage and responsible for making the payments on that obligation.

Petitioners went on an annual, week-long vacation to Puerto Rico and, occasionally, petitioner's daughters would go with them. Petitioner and Philip went on numerous gambling trips together. On some of those trips, petitioners' room, food, beverage, entertainment, and sometimes transportation (i.e., airfare) were paid for by the casino. Although petitioner did not gamble much, she did obtain the benefit of the amenities provided by the resort or casino. Philip gave petitioner a diamond wedding band, but petitioner did not receive much additional jewelry during their marriage. During April 1986, Philip purchased an automobile for petitioner at a cost of almost $14,000. Petitioner had a VISA credit card and other credit cards for major New York City area department stores, including Saks Fifth Avenue, Bloomingdale's, Fortunoff, A&S, and Macy's. During the years in issue, petitioner obtained a black mink coat. She also enjoyed the theater and attended many shows.

Petitioner's daughters' tuition and some expenses for private school education, tutoring, and college were paid for by Philip. Philip paid for food, clothing, and other expenses for petitioner's daughters, including the acquisition of an automobile for one of the daughters. During 1983, petitioner transferred stocks and bonds with a $20,000 value from her and Philip's joint account with Merrill Lynch to the account of one

of her daughters. Petitioner paid her daughters' and mother's income tax out of her joint bank account with Philip. Philip paid a total of approximately $15,000 for petitioner's daughter's wedding expenses.

Petitioners had a joint bank account from which to pay household expenses. Philip would deposit either cash or checks into the account for petitioner to use to pay various expenses. Petitioners also paid a variety of their expenses in cash. Philip would give petitioner the cash to pay for groceries, dry cleaning, domestic help, etc. The cash Philip gave petitioner was in addition to the money he deposited in their joint account. Philip also had several individual bank accounts.

Petitioners' recreation was combined with gambling. They went to Las Vegas, Nevada, on their honeymoon and took other vacations where gambling was a focal point, such as their annual trip to Puerto Rico. Philip would go on day trips to Atlantic City, New Jersey, or take weekend trips to Las Vegas, Nevada. Petitioner would occasionally accompany Philip on the weekend trips, or they would both go with their good friends Adrienne and Elwood Lerman (Lerman). Lerman was also petitioners' accountant and financial adviser. Some of these gambling trips would be "comped"; i.e., the casino would pay for travel, meals, and hotel room.

While on these trips, Philip would spend most of his time gambling in the casinos. He usually played at the craps table

and preferred the tables with a large minimum bet. While Philip gambled, petitioner would either play at a different table or go shopping. Petitioner was aware of the amount of time Philip spent gambling, and they would often argue about it.

Philip gambled with large amounts of money. He often signed markers to the casinos to get more cash with which to gamble. Philip tried to pay off the markers before they could be noticed by petitioner. When petitioner was with him, Philip tried to hide the size of his bets and his winnings or losings from her.

Petitioners would often go together or with the Lermans for an evening at the racetrack. Petitioner would make small bets during the evening, while Philip made larger, more substantial bets. He tried to keep the tickets hidden, or show petitioner tickets with smaller bets, so that she would not know how much money he was risking. Petitioners even invested in racehorses. They had an interest in several racehorses during the years in issue.

For the years in question, Philip reconstructed the amounts expended on gambling as follows:

| Year | Cash Philip | Marker Checks | Personal Checks to Casino | Total |
|------|-------------|---------------|---------------------------|-------|
| 1981 | --- | --- | --- | [1] |
| 1982 | $72,800 | -0- | -0- | $72,800 |
| 1983 | 137,400 | $36,000 | $8,300 | 181,700 |
| 1984 | 76,800 | 119,500 | 31,500 | 227,800 |
| 1985 | 63,500 | 112,500 | 500 | 176,500 |
| Total | | | | 658,800 |

[1] Petitioner did not provide any evidence of gambling expenditures for 1981.

The reconstruction is, to some extent, overstated because some of the source documents were shown not to reflect gambling expenditures. In addition, it has not been established that the amounts reflected were expended solely for gambling. The expenditures do not reflect the source of the funds expended. Some of the funds may represent winnings, and some may represent Philip's and petitioner's cash-flow from other income, tax savings, or other sources.

Petitioner was aware that Philip was an avid gambler both when she married him and during their marriage. During the years in issue, petitioner was not aware of the full extent of Philip's gambling expenditures. Philip wrote checks and depleted both his and the couple's checking accounts to the point where checks on the account used by petitioner for household matters were returned because of insufficient funds. By 1990, petitioner and Philip argued, and their relationship deteriorated due to Philip's gambling and the overdrawn accounts.

Petitioner's and Philip's joint income tax returns for the taxable years 1981 through 1985 reported income in the amounts of $297,982, $595,375, $216,932, $660,892, and $1,264,674. The income tax deficiencies determined by respondent for the taxable years 1981 through 1985 are as follows:

| Year | Income Tax Deficiency |
|------|----------------------|
| 1981 | $41,221.00 |
| 1982 | 129,944.00 |
| 1983 | 119,644.76 |
| 1984 | 183,985.50 |
| 1985 | 501,303.00 |
| Total | 976,098.26 |

Of the total of $976,098.26 for the 5 years, approximately 72 percent, or $702,791, is attributable to respondent's disallowance of the tax shelter deductions and carryback losses which represent the "grossly erroneous item".

On February 4, 1991, Philip and petitioner entered into a separation agreement.  Pursuant to the agreement, Philip assigned a partnership interest to petitioner.  At the time of trial, income distributions from the partnership amounted to $4,371 per month.  The separation agreement provided that, upon petitioner's vacating the condo, Philip would be entitled to live there and would be required to pay all expenses, taxes, utilities, etc. connected therewith.  By allowing Philip to reside in the condo, petitioner did not waive her ownership rights in the property. In the event of Philip's death, petitioner would receive full ownership of the condo.  Petitioner was given the other residential real property and certain specific personalty which was then located in the condo.  Petitioner also received a 1986 automobile under the separation agreement.

The separation agreement contained Federal income tax provisions as follows:

> Any refund payable with respect to any joint tax
> return, now or hereafter filed, shall be paid to the

Husband, and the Wife shall endorse refund checks such [sic] payment.  If there is any deficiency or tax liability assessed on any jointly filed tax return, such deficiency or tax liability, with any interest or penalties thereon, shall be paid solely by the Husband, and the said Husband does hereby forever save, hold harmless, indemnify and defend the Wife of, from and against any and all claim or claims that may be made against them or her for the payment, collection or satisfaction of any such tax, interest or penalty due or alleged to be or become due as a result of the filing and/or failure to file any such joint tax return.  * * *  The cost, if any[,] incurred or to be incurred by either of the parties in connection with the examination and/or audit of any such joint return shall be borne solely and exclusively by the Husband.

On April 9, 1992, petitioner, with Philip's consent, filed for a divorce.  Petitioner asserts that she and Philip were divorced during 1992.  As of the time of trial (April 6, 7, and 8, 1992), the separation agreement was still in effect; however, petitioner and Philip continued to live together at the same location.

                              OPINION

The U.S. Court of Appeals for the Second Circuit outlined its mandate to this Court as follows:

> The resolution of this issue [whether it would be inequitable to hold petitioner jointly liable for the tax deficiencies] depends upon a fact-intensive inquiry into the surrounding facts and circumstances.  I.R.C. §6013(e)(1)(D).  Relevant factors include significant benefits received as a result of the understatements by the spouse claiming relief, any participation in wrongdoing on the part of the "innocent" spouse, and the effect of a subsequent divorce or separation.  See S. Rep. No. 1537, 91st Cong., 2d Sess. (1970) (considering bill to amend the Internal Revenue Code of 1954), reprinted in 1970 U.S.C.C.A.N. 6089, 6092.  Normal support, measured by the circumstances of the parties, is not considered a significant benefit for purposes of this determination.  Flynn, 93 T.C. at 367

* * *.  The magnitude of Friedman's gambling losses,
which allegedly exceed the total tax deficiencies owed,
would be a factor weighing heavily in favor of a
finding that taxpayer did not personally benefit from
the tax shelter.  See Pietromonaco, 3 F.3d at 1348.
[Friedman v. Commissioner, 53 F.3d at 531.]

The statute requires that petitioner show that "taking into
account all the facts and circumstances, it is inequitable to
hold  * * * [her] liable".  Sec. 6013(e)(1)(D).  Petitioner bears
the burden of proof as to whether it would be inequitable to hold
her liable for the tax shelter portion of the deficiency.  Rule
142(a); Russo v. Commissioner, 98 T.C. 28, 31-32 (1992).  In
deciding whether it was inequitable to hold a spouse liable,
courts have considered whether the purported innocent spouse
benefited[5] beyond normal support, either directly or indirectly,
from the understatement of tax liability.  Hayman v.
Commissioner, 992 F.2d 1256, 1262 (2d Cir. 1993), affg. T.C.
Memo. 1992-228; Belk v. Commissioner, 93 T.C. 434, 440 (1989);
Purcell v. Commissioner, 86 T.C. 228, 242 (1986), affd. 826 F.2d
470 (6th Cir. 1987); H. Rept. 98-432 (Part 2), at 1501-1502
(1984); sec. 1.6013-5(b), Income Tax Regs.  Deduction items, to
the extent that they reduce taxpayers' tax burden, have the
potential to benefit the purported innocent spouse.  Bokum v.
Commissioner, 94 T.C. 126, 157 (1990), affd. 992 F.2d 1132 (11th
Cir. 1993).  Normal support is determined in the context of the

---

[5] The statute once required a significant benefit, but the
wording of the statute for the years under consideration does not
specify a significant benefit.  See Purificato v. Commissioner, 9
F.3d 290 (3d Cir. 1993), affg. T.C. Memo. 1992-580.

circumstances of taxpayers.  Sanders v. United States, 509 F.2d 162, 168 (5th Cir. 1975); Flynn v. Commissioner, 93 T.C. 355, 367 (1989).

Evidence of direct or indirect benefits may consist of property transfers, including transfers received several years after the year in which the erroneous deductions were claimed. See sec. 1.6013-5(b), Income Tax Regs.  This would include the division of property in a subsequent divorce proceeding. Pettinato v. Commissioner, T.C. Memo. 1995-85.  Finally, in deciding whether it is equitable to hold a spouse liable for deficiencies or "innocent" under section 6013(e), we are to consider the probable future hardships that would be imposed on the spouse seeking relief, if such relief was denied.  Sanders v. United States, supra at 171 n.16; Dakil v. United States, 496 F.2d 431, 433 (10th Cir. 1974).

Petitioner admits that her lifestyle may have been considered lavish, but it was the standard she had enjoyed during her marriage with Philip.  Respondent contends that petitioner and Philip entered into the marriage on a relatively equal financial footing and that any benefits to petitioner were earned and consumed during the marriage and the years in issue. Petitioner also contends that Philip gambled away the tax shelter benefits.  The tax benefits in question stem from a 1983 transaction for which losses were claimed for 1983, 1984, and

1985. In addition, net operating loss deductions were carried back to 1981 and 1982.

Although petitioner and Philip entered into their marriage on a similar footing as to assets, Philip had a substantial earning capacity and, from the beginning, was able to provide a high standard of living for himself, petitioner, and petitioner's daughters. Throughout the period under consideration, petitioners lived in high-quality residences. However, the important factor here is that their standard of living did not increase, either during or after the years that the grossly erroneous deductions drastically reduced their tax liability. Ultimately, in the separation agreement, petitioner received a partnership interest that provided her with about $4,300 per month, the right to the Fire Island property, a moderately priced 1986 automobile, and claim to her joint share of any equity in the condo. The $4,300 amount appears to approximate the monthly living expenditures attributable to petitioner. At the time of the separation agreement, the condo was substantially mortgaged, the Fire Island property had a relatively large mortgage, and the automobile was about 4 years old. The bulk of the assets received in accordance with the separation agreement was purchased for cash prior to the deduction of the "grossly erroneous items" in question. Other than a fur coat, petitioner did not receive lavish assets or jewelry during the marriage.

Petitioner did, however, enjoy the benefits of traveling to resorts in connection with gambling activities, and some of that travel was lavish. The amount of travel was about the same, before, during, and after the tax years for which the grossly erroneous deductions were claimed.

Philip's reported gross income, without considering deductions or the grossly erroneous amounts, ranged from a low of $297,982 to a high of $1,264,674 from 1981 through 1985. The record reflects that his reported income in other years was similar in amount. His income fluctuated due to the nature of his business activity--mortgage broker. That amount of income would have provided petitioners with a high standard of living without considering the tax savings generated by the tax shelter in question. A substantial portion of the tax savings was likely consumed by Philip's gambling losses. About $700,000 of tax savings is attributable to the grossly erroneous deductions generated by the subject tax shelter. During the same period, Philip's gambling activity consumed as much as $650,000. In subsequent years, Philip's gambling activity appears to have increased, and his losses also likely increased, ultimately ending in the conflict with petitioner that led to separation and, allegedly, to divorce. Our record does not reflect whether petitioner and Philip were actually divorced, but references to the divorce appear in the appellate briefs connected with this case. We are also unaware of the ultimate divorce settlement,

but accept the separation agreement as the model for the ultimate division of property.

Although petitioner continued to live with Philip after entering into the separation agreement, petitioner testified that she and Philip lived separately at the same location until she was able to move. The fact that petitioner and Philip continued to live together, as opposed to living separately and/or being divorced, militates against an inequity finding. See sec. 1.6013-5(b), Income Tax Regs. We also note that Philip, in the separation agreement, agreed to pay any tax deficiencies and save petitioner harmless from any expense connected with tax audits. The effect of such a promise has been considered by this Court on several occasions.[6] The impact on the relative equities of holding a spouse liable if the other spouse promises to pay joint tax deficiencies is dependent on whether the promise is reliable or speculative. Although Philip's actions toward petitioner have been amicable, his gambling habit, which was the root of petitioners' marital problems, renders his promise to pay the tax inconsequential. At the time of the separation agreement, petitioners' bank accounts were overdrawn, and significant pieces of property, like the condo, were fully mortgaged. Accordingly,

---

[6] See, e.g., Stiteler v. Commissioner, T.C. Memo. 1995-279; Foley v. Commissioner, T.C. Memo. 1995-16; Buchine v. Commissioner, T.C. Memo. 1992-36, affd. 20 F.3d 173 (5th Cir. 1994); Henninger v. Commissioner, T.C. Memo. 1991-574; Knapp v. Commissioner, T.C. Memo. 1988-109.

in this case, Philip's promise to pay is not considered reliable. See <u>Foley v. Commissioner</u>, T.C. Memo. 1995-16.

Based on the record, we find that petitioner has shown that she did not benefit beyond the amount of her normal support, either directly or indirectly, from the understatement of tax attributable to the grossly erroneous deductions.  Accordingly, we find that, if petitioner did not know and had no reason to know, as the U.S. Court of Appeals for the Second Circuit found, it would be inequitable to hold petitioner liable for the portion of the deficiencies and additions to tax attributable to these tax shelter items.  Based on our findings and in accordance with the holding of the U.S. Court of Appeals for the Second Circuit, we find that petitioner is an innocent spouse within the meaning of section 6013(e) as to the deficiencies in income tax and additions to tax attributable to the tax shelter items only.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155.</u>