T.C. Memo. 1997-231


UNITED STATES TAX COURT


FLOYD L. GARRETT AND DOROTHY G. GARRETT, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No.  16771-94.              Filed May 19, 1997.


<u>James V. Walker</u> and <u>Steven C. Koegler</u>, for petitioners.

<u>William R. McCants</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, <u>Judge</u>:  Respondent determined deficiencies, an
addition to tax, and accuracy-related penalties in petitioners'
Federal income taxes as follows:

| Year | Deficiency | Addition to Tax Sec. 6651(a)(1) | Accuracy-related Penalties Sec. 6662(h) | Sec. 6662(a) |
|------|-----------|-------------------|---------------|--------------|
| 1989 | $381,230 | -- | $89,600 | $31,446 |
| 1990 | 113,333 | [1]$30,784 | -- | 22,667 |
| 1991 | 53,347 | -- | -- | 10,478 |

[1]Respondent has conceded the addition to tax under sec. 6651(a)(1) in the amount of $30,784, and petitioners have conceded the addition to tax of $2,005.11 assessed per return under sec. 6651(a)(1).

After concessions, the issues remaining for decision are: (1) Whether petitioners are entitled to any basis in a collection of "muscle cars"[1] they sold in 1989; (2) whether petitioners were engaged in a trade or business that would entitle them to a business expense deduction regarding certain disallowed corporate expenses; (3) whether petitioners underreported ordinary income from Blumenstock Enterprises, Ltd., an S corporation; (4) whether petitioner Dorothy G. Garrett is entitled to innocent spouse relief pursuant to section 6013(e);[2] (5) whether petitioners are liable for accuracy-related penalties under section 6662(a) for 1989, 1990, and 1991 and under section 6662(h) for 1989.

---

[1]On brief, petitioners describe muscle cars as "factory hot rods * * * [with] high-performance, high-horsepower engines * * * with [a] four-speed manual transmission."  Most muscle cars in petitioners' 1989 collection were manufactured in the 1960's to early 1970's, and include, for example, a 1970 Ford Mustang Boss 429, a 1970 Plymouth Super Bird, a 1966 Corvette, and a 1967 Ford Fairlane.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts is incorporated herein by this reference.

<u>Petitioners</u>

Petitioners were married and resided in Fernandina Beach, Florida, at the time their petition was filed. Petitioners filed joint Federal income tax returns for 1989, 1990, and 1991.

Petitioners began divorce proceedings in 1992. On October 10, 1994, petitioners signed a mediated settlement agreement with respect to their divorce. In that agreement, Mr. Garrett agreed to indemnify Mrs. Garrett for all Federal income taxes, penalties, and interest accruing during their marriage through the calendar year 1992. In addition, the indemnification agreement provides Mrs. Garrett with a lien interest against Mr. Garrett's collection of automobiles until such time as the Federal income tax liability has been fully discharged and released. Although the marriage was dissolved in 1995, certain property issues are on appeal.

<u>Mr. Garrett's Corporations</u>

Mr. Garrett was the sole owner of Floyd Garrett, Inc. (FGI), a trucking company located in Fernandina Beach, Florida. FGI was

incorporated in 1979 and was in the business of hauling sludge and other waste products from pulp mill plants in the area to dump sites. During the years in issue, FGI was an S corporation under section 1366 and filed U.S. Income Tax Returns for an S Corporation (Forms 1120S).

During the years in issue, Mr. Garrett also owned 100 percent of Timber Transfer, Inc. (TTI), another trucking operation. TTI was incorporated in 1981. TTI was also an S corporation under section 1366 and filed Forms 1120S for the taxable years 1989, 1990, and 1991.

Mr. Garrett ran the day-to-day operations of both FGI and TTI until he sold both corporations in 1993.

Mr. Garrett also had an ownership interest in Blumenstock Enterprises, Ltd. (BEL), a mechanical construction company. BEL, an S corporation under section 1366, filed a Form 1120S for the taxable year 1991. Attached to this return was a single Schedule K-1 (Shareholder's Share of Income, Credits, Deductions, etc.), which showed that 100 percent of the claimed corporate loss in 1991 flowed to Mr. Garrett. There were no other shareholders listed on BEL's 1991 return, nor were there any other Schedule K-1's attached.

The following expenditures claimed by FGI, TTI, and BEL were among corporate expenses considered personal, nondeductible expenses by respondent during her audit of petitioners' 1989, 1990, and 1991 tax returns:

| Corporation | 1989 | 1990 | 1991 |
|---|---|---|---|
| FGE | $243,682 | $291,930 | $10,615 |
| TTI | 152,838 | 16,259 | -- |
| BEL | -- | -- | 40,503 |
| Total | $396,520 | $308,189 | $51,118 |

Petitioners do not dispute respondent's determination that these expenses were improperly deducted by the corporations or that the amounts are taxable income to them.  Most, but not all, of the above expenses for FGI and TTI related to Mr. Garrett's personally owned muscle cars.  Additionally, the expenses disallowed to BEL were checks that were written by or for Mr. Garrett.

Muscle Cars

1.  1989 Sale

Prior to 1989, Mr. Garrett collected muscle cars as a hobby. In January 1989, Mr. Garrett sold 25 automobiles from his muscle car collection for $1.2 million.[3]  On their Federal income tax return for 1989, petitioners claimed a basis of $800,000 in the muscle cars sold.  In the notice of deficiency, respondent determined that petitioners failed to demonstrate that they were entitled to any basis in the capital assets sold and, therefore, realized a gain of $1.2 million from the sale of the muscle cars.

---

[3]After this sale, Mr. Garrett had 10 muscle cars remaining from his original collection.

Mr. Garrett admits that collecting muscle cars was a personal hobby prior to the sale in 1989 and that he has no written documentation substantiating the claimed basis in the cars sold. Mr. Garrett also admits that prior to 1989, FGI and TTI issued checks to pay for the acquisition of the muscle cars. One or two years prior to trial, Mr. Garrett prepared from memory a reconstructed summary of expenses associated with the muscle cars sold in 1989. This reconstructed summary indicates purchase and renovation expenses totaling approximately $683,000 on the 25 cars sold in 1989. Mr. Garrett claims that this figure does not include any of the expenses improperly deducted by FGI, TTI, and BEL during 1989 and that a portion of the disallowed expenses should be added to this reconstructed figure to arrive at a total basis of $800,000. Petitioners did not produce any evidence that any corporate expenditures incurred during the years in issue were related to the specific cars sold in 1989.

2. Activities After 1989 Sale

After the sale of the 25 muscle cars in 1989, Mr. Garrett began purchasing and refurbishing additional cars to add to his remaining collection of 10 cars. Other than the cars sold in 1989, Mr. Garrett did not sell any muscle cars during or after the years in issue.[4] Petitioners did not claim any depreciation

---

[4]Mr. Garrett made occasional trades to get a better example of a particular car.

deductions or other expenses or report any other income on their 1989, 1990, or 1991 individual income tax returns relating to the muscle car collection. In contrast, FGI, TTI, and BEL claimed considerable expenses during these years, primarily for the acquisition and renovation of petitioners' muscle car collection. Respondent has determined that these expenses were improperly deducted by the corporations. Although petitioners do not dispute respondent's determination, they now contend that they were in the muscle car business during the years in issue and are entitled to deduct these expenses under section 162(a) on their individual Federal income tax returns.

During the years in issue, it was Mr. Garrett's general intention to open a muscle car museum at some future time in order to exhibit his collection of muscle cars and possibly sell some of the cars on display. In 1993, Mr. Garrett incorporated Floyd Garrett's Muscle Cars, Inc. (FGMCI), under the laws of the State of Tennessee. At the time of trial, Mr. Garrett had chosen a location in Sevierville, Tennessee, and was in the final stages of constructing a building on this site to house his collection of muscle cars. However, the muscle car museum was not open to the public at any time during the years in issue and had not yet opened at the time of trial. FGMCI owns the realty and the museum building and will have the occupational licenses and insurance to run Mr. Garrett's proposed muscle car museum. It is

Mr. Garrett's intention to transfer ownership of the muscle cars to FGMCI as well.

## Preparation of Petitioners' Tax Returns

Petitioners' tax returns were prepared in accordance with information that Mr. Garrett supplied to his certified public accountant, James Knutzen. Mr. Knutzen's firm performed accounting work for petitioners from 1978 until 1991. In addition to preparing petitioners' Federal income tax returns, Mr. Knutzen's firm prepared monthly financial statements, as well as quarterly and annual payroll tax returns for FGI and TTI. In preparing these documents, Mr. Knutzen's firm relied on bank statements, coded checks, receipts, and other information provided by Mr. Garrett or a representative of his corporations. Knutzen never audited petitioners or any of Mr. Garrett's companies. Although Mr. Knutzen was aware of Mr. Garrett's muscle car collection activities, his firm never reflected those activities as a business on petitioners' income tax returns for the years in issue.

## OPINION

## Issue One: Basis in the Muscle Cars Sold in 1989

The first issue for decision involves petitioners' proper basis in a collection of muscle cars sold in 1989 for $1.2

million.  On their 1989 Federal income tax return, petitioners claimed capital gain income of $400,000 on the sale of 25 muscle cars.  Petitioners reported a sale price of $1.2 million and claimed a basis of $800,000 in the cars sold.  Respondent determined that petitioners are not entitled to any part of the $800,000 basis claimed on the muscle cars and that petitioners thus have additional income in 1989 of $800,000.

Petitioners bear the burden of demonstrating that they are entitled to a basis in the muscle cars in excess of that determined by respondent.  Rule 142(a); Burnet v. Houston, 283 U.S. 223, 227-228 (1931).  Section 1012 provides that a taxpayer generally has a basis in property equal to its cost.  Cost is defined as "the amount paid for such property in cash or other property."  Sec. 1.1012-1(a), Income Tax Regs.  Under the circumstances present here, cost means the amount paid by petitioners.  Detroit Edison Co. v. Commissioner, 319 U.S. 98, 102 (1943); Borg v. Commissioner, 50 T.C. 257, 263 (1968).  Thus, we must determine what amount, if any, petitioners paid for the muscle car collection.

Mr. Garrett testified that he began collecting muscle cars in the mid-to-late 1970's.  Although petitioners admit that FGI and TTI issued checks to pay for some of the muscle car expenditures, petitioners contend that they had sufficient funds to acquire the collection using after-tax income from the

following sources: (1) Distributed income from the operation of FGI and TTI; (2) more than $300,000 borrowed from FGI and TTI from 1979 through 1988; (3) corporate bonuses of approximately $100,000 per year; and (4) proceeds from the sale of several parcels of real estate. In their attempt to support their position that they actually paid for the muscle cars, petitioners submitted their individual Federal income tax returns for taxable years 1984 through 1988, as well as Forms 1120 and 1120S for FGI and TTI for taxable years 1983 through 1988.

On the other hand, respondent argues that she disallowed the claimed basis in the muscle car collection because petitioners failed to present any evidence that established they actually paid for the property. See sec. 1012. Respondent contends that Mr. Garrett's corporations paid for the purchase and restoration of the muscle cars; therefore, petitioners paid nothing from their own funds for the collection sold in 1989.

We have reviewed petitioners' returns and do not find the figures stated in these documents persuasive. Petitioners have not provided this Court with any supporting documentation for either their individual Federal income tax returns or the corporate returns for the taxable years prior to 1989. Without supporting documentation, such as bank statements, canceled checks, and other corporate records, it is impossible to determine conclusively the true origin of the funds used to

acquire the muscle car collection.  Petitioners' failure to produce evidence within their possession and which, if true, would be favorable to them, raises the presumption that if produced, it would be unfavorable to them.  Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

The only evidence offered by petitioners to carry their burden is Mr. Garrett's own testimony and that of his accountant, Mr. Knutzen.  We find much of Mr. Garrett's testimony on this subject to be vague, confused, self-serving, and uncorroborated. Under the circumstances, we are not required to, and we do not, rely on that testimony to support petitioners' position in this case.  See Estate of DeNiro v. Commissioner, 746 F.2d 327, 330-331 (6th Cir. 1984), affg. in part and remanding in part T.C. Memo. 1982-497; Lovell & Hart, Inc. v. Commissioner, 456 F.2d 145, 148 (6th Cir. 1972), affg. T.C. Memo. 1970-335; Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); Hradesky v. Commissioner, 65 T.C. 87, 90 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976).

Nor do we find Mr. Knutzen's testimony any more persuasive on this issue.  When asked by petitioners' attorney what steps he took to verify the $800,000 basis claimed by Mr. Garrett, Mr. Knutzen provided the following testimony:

A.   Well, first of all I asked Mr. Garrett if he could come up with something to verify that basis in more detail.  He went--he came back and said that he had acquired these cars over years and years, and he had traded some, and he had improved some, and he didn't really have the detailed records.

     But I did require him to sign, not exactly an affidavit but something that was to the best of his ability.  And then I also, since I had known him for ten years, and I have a reputation as a CPA, I wanted to at least be satisfied that he had acquired enough net worth outside of the company to allow him to acquire that kind of inventory of vehicles.

     So I did a little worksheet, kind of a mental worksheet, as to if that would be possible, and I decided that, yes, he would have had enough personal assets to acquire that.

Q.   So at that point, you were satisfied that he had the after-tax resources to have invested $800,000 in the cars he sold in 1988?

A.   Yes, I did.

Q.   Okay.  Would you step us through the mental process you went through in proving that $800,000 basis to yourself?

A.   Well, just in--there is three aspects of that calculation, and the biggest one is that each year, pretty much from 1980 through '89, which is nine years, we would bonus him out approximately $100,000 a year at the end of the year to cover some of the items that we considered to be personal.

     And I presumed the majority of that was for muscle cars, because he had a regular salary of 3,000 a month for his living expenses.  So that is approximately 8-or 900,000; after tax, it would be maybe $500,000.

     That was the first and largest part of the calculation.  The second one was the loan balance. Even after these bonuses, he still had a loan balance with the company of in excess of $300,000.  And there again, I presumed that the majority of that was for these type of personal muscle cars.

And the last item was Mr. Garrett had bought and sold some real estate.  He was also a shrewd investor in real estate, and I <u>presumed</u> that some of those profits from real estate transactions had <u>probably</u> gone into this.

So I satisfied myself that he could have put up to that 800,000, and I was--and on that basis, I--you know, our firm did prepare the return.  [Emphasis added.]

It is clear from his testimony that Mr. Knutzen did not have any independent knowledge of the origin of the funds used to acquire the muscle car collection.  Rather, he relied solely on the representations of Mr. Garrett.  His presumptions regarding the source of the funds for the muscle car collection do not rise to the level of fact.  Mr. Knutzen testified that he never audited Mr. Garrett's corporations.  He also admitted on cross-examination that Mr. Garrett could have expended $200,000 of the corporations' funds for personal expenses in 1987 or 1988 without Mr. Knutzen's knowledge.

Furthermore, FGI, TTI, and BEL made substantial expenditures for the benefit of petitioners that were claimed as deductible business expenses by these corporations.  These expenses total $755,827 for the 3 years in issue, most of which relate to Mr. Garrett's muscle car collection.

Based on our review of the entire record in this case, including the lack of any documentation supporting petitioners' expenditures for the purchase and renovation of the muscle cars, the pattern of disallowed deductions taken during the years in

issue, and the fact that FGI and TTI issued corporate checks to pay for the muscle cars prior to 1989, we are inclined to believe that Mr. Garrett's wholly owned companies, FGI and TTI, were the source of funds for the acquisition and renovation of the muscle cars sold in 1989.[5]  We find that petitioners do not satisfy their burden of proving that they paid for the muscle car collection.  We, therefore, sustain respondent's determination that petitioners are not entitled to any basis in the automobiles sold in 1989.[6]

Issue Two:  Disallowed Corporate Deductions

---

[5]The pattern of improper deductions taken by the corporations during the years in issue suggests that similar deductions were taken in prior years.  Any deductions taken by Mr. Garrett's S corporations would have reduced the profits reflected and, thus, reduced the taxable income of petitioners. If this is what occurred, petitioners would receive a double tax benefit if they were now allowed a basis with respect to previously deducted amounts.  See Hughes & Luce, L.L.P. v. Commissioner, T.C. Memo 1994-559, affd. on other grounds 70 F.3d 16 (5th Cir. 1995).

[6]Petitioners urge us to apply Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930), affg. in part and remanding in part 11 B.T.A. 743 (1928).  Under the so-called Cohan rule, where the taxpayer is unable to substantiate expenses through adequate records or other proof, we may estimate the deductible amount, if some deductible amount is suggested by other evidence, bearing heavily, if we choose, upon the taxpayer whose inexactitude is of his own making.  Id. at 543-544.  However, in order for us to estimate the amount of an expense, we must have some basis upon which an estimate may be made.  Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985).  There must be sufficient evidence assuring this Court that some amount was in fact spent or incurred by the taxpayer for the stated purpose.  Without such confirmation, "relief to the taxpayer would be unguided largesse."  Williams v. United States, 245 F.2d 559, 560 (5th Cir. 1957).

The second issue for decision is whether petitioners were engaged in a trade or business that would allow them to deduct the expenses of acquiring and refurbishing their muscle car collection after the sale in 1989. Respondent disallowed certain expenses deducted by FGI, TTI, and BEL on their respective Forms 1120S for tax years 1989, 1990, and 1991. Respondent determined that these expenses were personal, nondeductible payments by the corporations. Petitioners do not dispute respondent's determination that these amounts should not have been deducted by the corporations. Rather, petitioners argue that these expenses are deductible by them under section 162(a) on their individual tax returns as expenses incurred in the trade or business of muscle cars.[7]

Petitioners have identified and classified certain of these expenses that relate to the refurbishment and acquisition of petitioners' muscle car collection during the years 1989, 1990, and 1991. The information provided by petitioners may be summarized on a year-by-year basis and compared to the total amount of deductions disallowed by respondent as follows:[8]

---

[7]Petitioners apparently contend that the resulting increase in distributable income from the corporations caused by the disallowance of these deductions was then, in turn, deductible by them on their individual income tax returns as trade or business expenses.

[8]We make no finding as to the accuracy of the information provided by petitioners. We include it merely to show the approximate amount of expenses improperly deducted by the corporations during the years in issue with respect to petitioners' muscle car collection.

| Year | Corporation | Muscle Car Expense | Improper Deduction |
|------|-------------|--------------------|--------------------|
| 1989 | FGI | $202,453 | $243,682 |
|      | TTI | 136,645 | 152,838 |
|      | BEL | -- | -- |
| 1990 | FGI | 257,604 | 291,930 |
|      | TTI | 16,259 | 16,259 |
|      | BEL | -- | -- |
| 1991 | FGI | 2,123 | 10,615 |
|      | TTI | -- | -- |
|      | BEL | 9,487 | 40,503 |
| Totals |  | $624,571 | $755,827 |

Respondent agrees that these expenses relate to petitioners' muscle car collection; however, she disagrees that the expenditures constitute deductible expenses.  Respondent argues that petitioners have not established that these expenditures are ordinary and necessary, as opposed to capital expenditures, and that petitioners had not yet entered into a trade or business in 1989, 1990, or 1991; i.e., petitioners' activities were preparatory, at best, to future business activities.  We agree.

A taxpayer who is carrying on a trade or business may deduct all the ordinary and necessary expenses paid or incurred in connection with the operation of the business.  Sec. 162(a). However, an expense paid or incurred must be capitalized and may not be deducted if it materially enhances the value, use, life expectancy, strength, or capacity of the property.  Sec. 1.263(a)-1(b), Income Tax Regs.  Petitioners have not proven that the expenditures in question did not materially enhance the value, use, life expectancy, or strength of the muscle cars.

Indeed, the evidence available suggests that these expenditures were capital expenditures.

To be deductible, the expenses must also have been paid or incurred after the taxpayer's trade or business actually commenced; expenses incurred prior to that time are nondeductible preopening expenses.  Richmond Television Corp. v. United States, 345 F.2d 901, 907 (4th Cir. 1965), vacated and remanded on other issues 382 U.S. 68 (1965), original holding on this issue reaffd. 354 F.2d 410, 411 (4th Cir. 1965), overruled on other grounds NCNB Corp. v. United States, 684 F.2d 285, 288-289 (4th Cir. 1982); Jackson v. Commissioner, 86 T.C. 492, 514 (1986), affd. 864 F.2d 1521 (10th Cir. 1989); Goodwin v. Commissioner, 75 T.C. 424, 433 (1980), affd. without published opinion 691 F.2d 490 (3d Cir. 1982); McManus v. Commissioner, T.C. Memo. 1987-457, affd. without published opinion 865 F.2d 255 (4th Cir. 1988); see also sec. 195.[9]

> Section 162 does not allow deductions for otherwise
> deductible expenses until such time as the trade or
> business begins to function as a going concern even
> though the taxpayer may have made a firm decision to
> enter into business and has expended considerable sums
> of money in preparation of commencing business.  * * *
> [Jackson v. Commissioner, supra at 514.]

---

[9]Sec. 195 provides that preopening or startup expenses are not fully deductible in the year incurred and must be amortized over a period of not less than 60 months beginning with the month in which the taxpayer begins business.  We make no determination as to whether these expenses would qualify as sec. 195 expenses if and when the trade or business begins.

Mr. Garrett testified that prior to the sale in 1989, he considered his muscle car collection activity to be a hobby. On brief, petitioners recognize that Mr. Garrett's activity will not be considered a trade or business if he does not show that he engaged in the activity with continuity and regularity and with the primary purpose of earning income or profit. Further, they recognize that sporadic activity, a hobby, or an amusement diversion will not qualify as a business.

The evidence does not support Mr. Garrett's claim that his activity shifted from a hobby to a trade or business during the years in issue. Mr. Garrett's method of acquiring and paying for muscle cars by using corporate funds, which were then improperly deducted, apparently remained the same. There is no proof that petitioners' record keeping (or lack thereof) changed and no business activity with respect to the muscle cars was reported on petitioners' income tax returns. In fact, Mr. Garrett referred to his muscle car collecting activities as a hobby as recently as 1991 in an interview for a local newspaper. Therefore, we find that Mr. Garrett's activities during the years in issue were simply a continuation of Mr. Garrett's hobby and not a trade or business.

Even if Mr. Garrett hoped to establish a museum in the future, his purchase and refurbishment of muscle cars were, at most, preparations for entry into the trade or business of operating a muscle car museum and not activities that constituted

an active trade or business. Certainly, if purchasing and renovating muscle cars were to be considered a business, it would have to be a business that would produce income. Here, income could be produced by using the cars in the business of collecting admission from museum patrons and from the sale of the refurbished muscle cars. Petitioners contend that they were involved in both of these activities and that each was a separate business.

In determining whether a taxpayer engages in two or more separate activities, section 1.183-1(d)(1), Income Tax Regs., provides that

> all the facts and circumstances of the case must be taken into account. Generally, the most significant facts and circumstances in making this determination are the degree of organizational and economic interrelationship of various undertakings, the business purpose which is (or might be) served by carrying on the various undertakings separately or together in a trade or business or in an investment setting, and the similarity of various undertakings. Generally, the Commissioner will accept the characterization by the taxpayer of several undertakings either as a single activity or as separate activities. The taxpayer's characterization will not be accepted, however, when it appears that his characterization is artificial and cannot be reasonably supported under the facts and circumstances of the case. * * *

Contrary to petitioners' assertion, we do not find that, during the years in issue, Mr. Garrett was in the trade or business of refurbishing muscle cars for resale. There is no evidence that Mr. Garrett sold any muscle cars during the years

in issue other than the collection sold in 1989, which Mr. Garrett admitted was before he decided to enter the muscle car business. Rather, the record indicates that Mr. Garrett considered the operation of the muscle car museum essential to his muscle car business. Mr. Garrett testified that it was his intention to make a profit from his muscle car business in only two ways: (1) From museum ticket and souvenir sales generated by the exhibition of the museum's muscle car collection; and (2) from the sale of some muscle cars displayed in the museum. Consistent with this statement of intention, the majority of the evidence presented by petitioners on this issue involved testimony related to Mr. Garrett's plans for a muscle car museum. Furthermore, Mr. Garrett testified that no part of his muscle car business would be viable if the planned museum is unsuccessful. Therefore, the facts of this case do not reasonably support a characterization of petitioners' undertakings as separate activities. Rather, we find that petitioners' business purpose would be served by carrying out the various activities as a single enterprise, the muscle car museum.

Petitioners' prospective muscle car business--the muscle car museum--could not function as a going concern until such time as it was open to the public. Walsh v. Commissioner, T.C. Memo. 1988-242, affd. without published opinion 884 F.2d 1393 (6th Cir. 1989)(holding that a restaurant could not function as a going concern until it was open to the public). Mr. Garrett testified

that, even as of the date of this trial, the museum doors had not yet been opened to the public. Petitioners have not carried their burden of proving that they are entitled to deduct the claimed expenses under section 162(a).[10] We, therefore, sustain respondent's determination on this issue.

## Issue Three: Income From Blumenstock Enterprises, Ltd.

To resolve the next issue, we must determine Mr. Garrett's ownership percentage in BEL during 1991. Respondent disallowed certain expenses claimed by BEL in 1991, thus increasing petitioners' ordinary income by $34,895. After inspecting canceled checks, paid invoices, and adjusting journal entries of BEL, respondent submitted lists of these specific items to BEL's corporate representative who confirmed that these items represented nonbusiness, personal expenditures. Petitioners acknowledge that the expenses were not allowable deductions of

---

[10]Petitioners contend that if they cannot deduct all the muscle car expenditures during the years in issue, then they should be allowed to depreciate the muscle cars under sec. 167. Depreciation is not allowed on assets acquired for a business that has not begun operations. Piggly Wiggly Southern, Inc. v. Commissioner, 84 T.C. 739, 745-746 (1985), affd. on other issues 803 F.2d 1572 (11th Cir. 1986). Petitioners themselves have not treated the muscle car collection as a depreciable asset. They have never taken a depreciation deduction expense for the muscle cars on their individual Federal income tax returns. In light of our finding that petitioners' operations did not function as a going concern, we conclude that they are not entitled to any depreciation expense under sec. 167. In addition, petitioners have failed to provide any substantiation of their alleged basis in the specific cars they wish to depreciate.

BEL.  However, Mr. Garrett testified that he owned only 50 percent, not 100 percent, of the S corporation.  Therefore, petitioners contend that only 50 percent of the additional income is taxable to them.

Section 1366 provides that a shareholder of an S corporation shall take into account the shareholder's pro rata share of income earned by the corporation as if such income were realized directly from the source as realized or incurred by the corporation.  The burden is on petitioners to prove the respondent's determinations are incorrect.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

The evidence in this case does not support petitioners' argument that Mr. Garrett was only a 50-percent shareholder in BEL.  The corporate return of BEL treats Mr. Garrett as the sole shareholder for the taxable year 1991.  Only one Schedule K-1 is attached to BEL's Form 1120S for 1991.  This Schedule K-1 lists Mr. Garrett as owning 100 percent of the stock of BEL for 1991.  Petitioners failed to produce evidence of any other BEL shareholders to support Mr. Garrett's self-serving testimony.  Consequently, we find that Mr. Garrett was the sole shareholder of BEL in 1991 and that petitioners understated their distributive share of ordinary income from BEL by $34,895 for 1991.

Issue Four:  Innocent Spouse Relief

The fourth issue for decision is whether Mrs. Garrett qualifies as an innocent spouse pursuant to section 6013(e) with respect to the deficiencies for 1989, 1990, and 1991. Generally, a husband and wife are jointly and severally liable for the total tax due on their joint Federal income tax returns. Sec. 6013(d). In limited circumstances, however, a spouse may qualify as an "innocent spouse" and be relieved of joint and several liability. Sec. 6013(e). The spouse seeking relief under section 6013(e) has the burden of proof. Rule 142(a); Bokum v. Commissioner, 94 T.C. 126, 138 (1990), affd. 992 F.2d 1132 (11th Cir. 1993).

For Mrs. Garrett to qualify for innocent spouse status, she must prove: (1) She and Mr. Garrett filed a joint tax return; (2) on that joint tax return, there was a substantial understatement of tax attributable to grossly erroneous items of the other spouse; (3) in signing the joint tax return, she did not know, nor had reason to know of the substantial understatement; and (4) taking into account all the facts and circumstances, it is inequitable to hold her liable for any deficiency attributable to the substantial understatement. Sec. 6013(e)(1)(A)-(D). Failure to prove any one of these requirements will prevent Mrs. Garrett from qualifying as an innocent spouse. Bokum v. Commissioner, supra at 138. Respondent concedes that petitioners filed joint tax returns for 1989, 1990, and 1991 and that the understatements on those returns were substantial.

We find that Mrs. Garrett has failed to show that it would be inequitable to hold her jointly and severally liable for the disputed taxes. An important factor in determining whether it is inequitable to hold a spouse liable is whether that spouse significantly benefited, either directly or indirectly, from the understatement of taxes. Belk v. Commissioner, 93 T.C. 434, 440 (1989); Purcell v. Commissioner, 86 T.C. 228, 242 (1986), affd. 826 F.2d 470 (6th Cir. 1987); sec. 1.6013-5(b), Income Tax Regs. Normal support is not considered a significant benefit. Terzian v. Commissioner, 72 T.C. 1164, 1172 (1979). Mrs. Garrett bears the burden of proving that she received no significant benefit from the unreported income other than normal support, and this burden must be supported with specific evidence of lifestyle expenditures, as well as asset acquisitions. Bokum v. Commissioner, 94 T.C. at 157; Estate of Krock v. Commissioner, 93 T.C. 672, 681 (1989).

Mrs. Garrett failed to provide any evidence of lifestyle expenditures or asset acquisitions. In fact, she did not even testify at trial. Thus, Mrs. Garrett failed to show that she did not significantly benefit from the understatements in a manner that was above her normal support.

Moreover, Mr. Garrett signed an indemnification agreement promising to pay all tax liabilities resulting from the filing of their joint tax returns through 1992. The effect of such a promise has been considered by this Court on several occasions

with regard to granting innocent spouse relief.  See, e.g.,
Stiteler v. Commissioner, T.C. Memo. 1995-279, affd. without
published opinion 108 F.3d 339 (9th Cir. 1997); Foley v.
Commissioner, T.C. Memo. 1995-16; Buchine v. Commissioner, T.C.
Memo. 1992-36, affd. 20 F.3d 173 (5th Cir. 1994); Henninger v.
Commissioner, T.C. Memo. 1991-574; Knapp v. Commissioner, T.C.
Memo. 1988-109.  The degree to which Mr. Garrett's promise
influences the inequity of holding Mrs. Garrett liable depends
upon whether his promise is reliable or speculative.  Stiteler v.
Commissioner, supra.  Mrs. Garrett has not demonstrated that Mr.
Garrett would not honor his obligation to pay the underlying tax
deficiencies for the years in issue.  Furthermore, the indemnity
agreement provides for a lien against Mr. Garrett's muscle car
collection until such time as the Federal income tax liability
has been fully discharged and released.[11]

In addition to demonstrating that it would be inequitable to
hold her liable for any deficiency, Mrs. Garrett must also show
that she had no reason to know of the understatement.  As to
having reason to know, the standard is whether "a reasonably
prudent taxpayer under the circumstances of the spouse at the
time of signing the return could be expected to know that the tax
liability stated was erroneous or that further investigation was
warranted."  Stevens v. Commissioner, 872 F.2d 1499, 1505 (11th

---

[11]Mr. Garrett testified that, at the time of trial, he has
over $3 million invested in a total of 64 muscle cars.

Cir. 1989) (fn. ref. omitted), affg. T.C. Memo. 1988-63.  The test for constructive knowledge of an understatement is a subjective one, focusing on the following factors:  (1)  The spouse's level of education; (2) the spouse's involvement in the business and financial affairs of the marriage and in the transactions that gave rise to the understatement; (3) the presence of expenditures that appear lavish or unusual when compared to the taxpayers' accustomed standard of living and spending patterns; and (4) the culpable spouse's evasiveness and deceit concerning family finances.  Edmondson v. Commissioner, T.C. Memo. 1996-393.

Mrs. Garrett has presented no evidence as to any of these factors.  In contrast, Mr. Garrett testified that Mrs. Garrett was aware of his muscle car collection and that he did not hide any assets or transactions from her.  Accordingly, we find that Mrs. Garrett failed to demonstrate that she neither knew, nor had reason to know, about the substantial understatements at the time petitioners' returns were signed.

Mrs. Garrett has not satisfied her burden of proof with respect to two essential elements.  Therefore, she does not qualify as an innocent spouse within the meaning of section 6013(e).

Issue Five:  Accuracy-Related Penalties

Finally, we must decide whether accuracy-related penalties are appropriate for any of the years in issue. Respondent determined that petitioners are liable for section 6662 accuracy-related penalties for 1989, 1990, and 1991. Section 6662(a) imposes a penalty in an amount equal to 20 percent of the portion of the underpayment of tax attributable to one or more of the items set forth in subsection (b). Respondent asserts that the section 6662(a) penalties for 1989, 1990, and 1991 were due to negligence or disregard of rules or regulations and represent substantial understatements of income tax. Sec. 6662(b)(1) and (2).

The accuracy-related penalty does not apply with respect to any portion of the underpayment if it is shown that there was reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion. Sec. 6664(c)(1). The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all the pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. The most important factor is the extent of the taxpayer's effort to assess his proper tax liability for the year. Id.

Petitioners contend that the accuracy-related penalties are inappropriate in this case, because they relied on their certified public accountant, Mr. Knutzen, to prepare their tax returns accurately. Generally, the duty of filing accurate

returns cannot be avoided by placing the responsibility on a tax return preparer. Metra Chem Corp. v. Commissioner, 88 T.C. 654, 662 (1987). However, reliance on a qualified adviser may demonstrate reasonable cause and good faith if the evidence shows that the taxpayer contacted a competent tax adviser and provided the adviser with all necessary and relevant information. Jackson v. Commissioner, 86 T.C. 492, 539-540 (1986), affd. 864 F.2d 1521 (10th Cir. 1989); Daugherty v. Commissioner, 78 T.C. 623, 641 (1982); Magill v. Commissioner, 70 T.C. 465, 479 (1978), affd. 651 F.2d 1233 (6th Cir. 1981); Pessin v. Commissioner, 59 T.C. 473, 489 (1972). In addition, even if petitioners can establish the above requirements, they still have a duty at least to read and make a cursory review of the return and make sure all income items are included. Metra Chem Corp. v. Commissioner, supra at 662; Magill v. Commissioner, supra at 479-480.

Petitioners failed to establish that they supplied Mr. Knutzen with complete and accurate information. Taxpayers who control the affairs of a corporation cannot establish that they provided correct information to their return preparer if the corporate records they provide incorrectly reflect that alleged business expenses did not benefit the individual. Magill v. Commissioner, supra at 479. Mr. Garrett either failed to disclose or concealed from Mr. Knutzen the true extent of personal expenditures made with the corporate funds of FGI and TTI by providing canceled checks, check stubs, and receipts that

did not accurately reflect the personal nature of the expenditures.  Moreover, petitioners failed to demonstrate what advice they relied on.  Finally, petitioners did not establish that they reviewed the returns in issue to make sure that all income items were included.  Accordingly, we sustain respondent's determination and find that petitioners are liable for the accuracy-related penalties under section 6662(a) in 1989, 1990, and 1991.

Respondent also determined that petitioners are liable for the 40-percent penalty for gross valuation misstatements provided under section 6662(h) with respect to the adjusted basis of the muscle car collection stated on petitioners' 1989 return.[12] There is a "gross valuation misstatement" if the value or adjusted basis on any property claimed on a return is 400 percent or more of the correct amount.  Sec. 6662(e), (h); sec. 1.6662-5(e)(2), Income Tax Regs.  Section 1.6662-5(g), Income Tax Regs., provides that "The value or adjusted basis claimed on a return of any property with a correct value or adjusted basis of zero is considered to be 400 percent or more of the correct amount."  On their 1989 Federal income tax return, petitioners claimed a basis of $800,000 on the muscle cars sold in 1989.  We find that

_____

[12]Sec. 6662(h) provides in part:

To the extent that a portion of the underpayment to which this section applies is attributable to one or more gross valuation misstatements, subsection (a) shall be applied with respect to such portion by substituting "40 percent" for "20 percent".

petitioners did not prove that they had a basis in the collection sold and, thus, petitioners had a zero basis in the cars. Therefore, we sustain respondent's determination and find that petitioners are liable for the 40-percent accuracy-related penalty on the adjusted basis of the muscle car collection.

<u>Decision will be entered under Rule 155</u>.